Douglas SPIEKER and Sheryl Spieker, Plaintiffs and Appellants,

v.

WESTGO, INC., Defendant and Third Party Plaintiff.

NELSON IMPLEMENT AND CHEVROLET CO., Joseph Breker and Clarence Breker, Defendants,

v.

G & G MFG. CO., INC., Third–Party Defendant and Appellee.

Civ. No. 900435.

Supreme Court of North Dakota.

Jan. 9, 1992.

Kim E. Brust, of Conmy, Feste, Bossart, Hubbard & Corwin, Ltd., Fargo, for plaintiffs and appellants. Appearance by Robert Schultz.

Craig R. Campbell, of Gunhus, Grinnell, Klinger, Swenson & Guy, Fargo, for third-party defendant and appellee.

VANDE WALLE, Justice.

Douglas and Cheryl Spieker appealed from a judgment, entered on a jury verdict, dismissing their products liability action against G & G Manufacturing Co., Inc., and from orders denying their post-trial motions. We affirm.

On October 19, 1986, Douglas, a sales manager for a hardware company in Fargo, was seriously injured while helping Clarence and Joseph Breker harvest corn at the Breker farm near Havana, North Dakota. Douglas's wife, Cheryl, is Clarence's daughter and Joseph's sister. When the accident occurred, Douglas was unloading corn from a truck into a dryer bin with an auger which was driven by a power take-off driveline [PTO] connected to a tractor. Douglas testified that he started the tractor, engaged the PTO with a lever behind the tractor seat, and got off the tractor to open the tailgate of the truck. According to Douglas, he then heard a loud bang and was struck in the right arm and left leg by the auger tube.

The Spiekers brought this products liability action against the manufacturer of the

auger, Westgo, Inc.; the manufacturer of the PTO, G & G; the party who sold the auger to the Brekers, Nelson Implement; and Clarence and Joseph Breker. The Spiekers settled their claims against Westgo, the Brekers, and Nelson Implement leaving only their strict liability, breach of warranty, and negligence claims against G & G. Prior to trial the court determined that the statute of limitations barred the Spiekers' breach of warranty claim and granted G & G's motion to exclude evidence on that claim at trial.

At trial on the negligence and strict liability claims, the Spiekers presented evidence that the accident was the result of "critical speed" or vibration failure of the PTO caused by a combination of its overextension and excessive speed. The Spiekers presented evidence that the PTO was negligently designed and was defective and unreasonably dangerous because it did not have a "pin stop" to prevent overextension and it did not have adequate warnings about overextension and excessive speed. G & G presented evidence that the accident was not caused by vibration failure, but by torsional buckling when the tractor moved and the auger locked. G & G presented evidence that the PTO had a discolored area where a warning label had been removed and that the owner's manual for the auger included warnings about overextension and excessive speed. G & G also presented evidence that a "pin stop" was unreasonably dangerous because it created a hazard that the auger could be pulled over onto the tractor operator.

The jury returned a special verdict, finding that G & G was not negligent and that the PTO was not defective and unreasonably dangerous to the ordinary and prudent user when it left the possession of G & G. The trial court denied the Spiekers' motions for a judgment notwithstanding the verdict and for a new trial, and they have appealed.

## JURY INSTRUCTIONS

The Spiekers contend that the trial court erred in instructing the jury on their negligence and strict liability claims and in failing to give instructions requested by them.

■ It is well established that jury instructions must fairly inform the jury of the applicable law. E.g., *Oanes v. Westgo, Inc.*, 476 N.W.2d 248 (N.D.1991). On appeal, we review jury instructions as a whole and if they correctly advise the jury of the law, they are sufficient although parts of the instructions, standing alone, may be erroneous and insufficient. *Id.*

In considering jury instructions in products liability cases, we have also said

"that negligence and strict liability in tort are separate and distinct theories of products liability and that each theory has a different focus.... Strict liability in tort focuses on whether or not a product is defective and unreasonably dangerous.... Negligence focuses on whether or not the conduct of the manufacturer or seller falls below the standard of reasonable care...." *Oanes, supra*, 476 N.W.2d at 253.

In this case, the Spiekers argue that the trial court erred in giving the following instruction:

"In order for Defendant to be found liable for a defective design, Plaintiffs must prove by the greater weight of the evidence that the Defendant failed to use reasonable care in its design and that such failure resulted in a defective condition which was unreasonably dangerous...."

They assert that instruction erroneously required them to prove that G & G was negligent in order for the jury to find that the PTO was defective and unreasonably dangerous under their strict liability claim. They contend that this instruction totally negated their strict liability claim and was equivalent to a refusal to instruct the jury on that theory.

In *Oanes, supra*, the plaintiffs argued that an identical instruction was erroneous because it required them to prove a product was defective and unreasonably dangerous in order for the jury to find liability based on their negligent design claim. We said the instruction was a correct statement of the law for a negligent design case because

"an element of a negligent design case is that the product is defective or unsafe." *Oanes, supra*, 476 N.W.2d at 253. Here, the Spiekers make the converse argument that this instruction required them to prove that G & G was negligent in order for the jury to find that the PTO was defective and unreasonably dangerous under their strict liability claim.

■ Although this instruction is not specifically labeled,[1] the entire instruction provides that "[t]he manufacturer of a product has a duty to use reasonable care in its design to make the product reasonably safe for the purposes for which it is intended to be used." The "reasonable care" language indicates that this instruction apprised the jury about the Spiekers' negligent design claim. See *Oanes, supra* [negligence focuses on whether or not the conduct of the manufacturer falls below the standard of reasonable care]. This negligent design instruction immediately precedes the instruction labeled "Essential Elements—Strict Liability" which provides, in part, that the

"rule of strict liability applies even though the Defendant exercised all possible care in the manufacture and sale of the product." The court instructed the jury that "under a strict liability in tort theory, the focus is on the product and not the defendant's conduct" and that in order to prevail on their strict liability claim, the Spiekers must prove by the greater weight of the evidence that the PTO was in a defective condition which rendered it unreasonably dangerous. The instructions also defined "defective product" and "unreasonably dangerous"[2] in language that focused on the condition of the product and not on the conduct of G & G. Separate special verdict forms required the jury to separately consider the Spiekers' negligence and strict liability claims.

We believe this negligence instruction on a manufacturer's duty to use reasonable care in the design of a product, when read as a whole and in conjunction with the other instructions, fairly and adequately advised the jury on the difference between

1. Because of the separate focus of negligence and strict liability claims, it is advisable for a trial court to clearly separate and label all instructions pertaining to those separate claims. *Cf. Oanes v. Westgo, Inc.*, 476 N.W.2d 248, 253 n. 6 (N.D.1991) [It is advisable to use separate special verdict interrogatories in cases involving theories of negligent design and negligent failure to warn].

Although in this case we sustain the instructions, as a whole, our decision is not an endorsement of these instructions as a model for products liability cases. In this respect we agree with the trial court's statement in denying the Spiekers' motion for a new trial that "[g]iven the luxury of post trial reflection, this Court admits the jury instructions could be improved upon."

2. The instructions defined "defective product" and "unreasonably dangerous":

"No product is considered to have a defect or to be in a defective condition, unless at the time the product was sold by the manufacturer, or other initial seller, there was a defect or defective condition in the product which made the product 'unreasonably dangerous.'

"A defect or defective condition in a product is considered 'unreasonably dangerous' if it renders that product dangerous to an extent beyond which would be contemplated by the ordinary and prudent buyer, consumer, or user of that product in that community, tak-

ing into consideration the product's characteristics, propensities, risks, dangers, and uses, as well as any actual knowledge, training, or experience possessed by that particular buyer, user, or consumer.

"A product is not considered 'defective' or 'unreasonably dangerous' merely because it is possible that an injury may occur while the product is being used. Neither is it considered defective or unreasonably dangerous if it is reasonably safe for its intended and any reasonably foreseeable use. Moreover, if it was in a safe condition at the time a Defendant parted with possession of it and later mishandling or abuse or other causes made it harmful by the time of the accident, that Defendant may not be found strictly liable to Plaintiffs.

"In determining whether a product is unreasonably dangerous, the following factors may be considered:

"(1) the usefulness and desirability of the product, (2) the availability of other and safer products to meet the same need, (3) the likelihood of injury and its probable seriousness, (4) the obviousness of the danger, (5) common knowledge and normal public expectation of the danger, particularly for established products, (6) the avoidability of injury by care in the use of the product, including the effect of instructions or warnings, and (7) the ability to eliminate the danger without seriously impairing the usefulness of the product or making it unduly expensive."

the Spiekers' negligent design and strict liability claims. The instructions, as a whole, did not require the Spiekers to prove that G & G was negligent in order for the jury to find that the PTO was defective and unreasonably dangerous under their strict liability claim.

■ The Spiekers argue that the trial court erred in instructing the jury that "[w]here the danger ... is known or should be known to the user, the law imposes no duty to warn" and that "[a] duty to warn ... arises only if ... [t]he danger to be warned of is not one that is obvious." [3] Relying on *Oanes, supra; Butz v. Werner*, 438 N.W.2d 509 (N.D.1989); and *Olson v. A.W. Chesterton Co.*, 256 N.W.2d 530 (N.D.1977), the Spiekers assert that this language is erroneous because obviousness of the danger does not automatically preclude liability for failure to warn and is merely one factor to be considered in determining whether a product is unreasonably dangerous. See also, *Morrison v. Grand Forks Housing Authority*, 436 N.W.2d 221 (N.D.1989). The Spiekers contend that this language deprived them of their negligence and strict liability claims based upon failure to warn.

In *Oanes, supra*, we said that similar language, standing alone, erroneously informed the jury that a manufacturer has no duty to warn if the danger is obvious, known, or readily discoverable because obviousness of danger is merely one factor to consider in determining whether a product

---

**3.** In their entirety, those instructions provided:

"MANUFACTURER'S DUTY TO WARN

"A manufacturer of goods has a duty to give a reasonable warning as to dangers inherent or reasonably foreseeable in using the product in a manner specified by the manufacturer or in any manner the manufacturer could reasonably foresee. The warning must be such as would cause an individual of ordinary prudence to exercise for his own safety caution commensurate with the potential danger in the designed or anticipated use.

"It is a question of fact for the jury to determine whether any reasonably adequate warning should have been given to alert an ordinary user to any potential danger in the designed or anticipated use of the goods, so as to render the good not unreasonably dangerous to an ordinary user.

"An adequate warning is by definition one that would in the ordinary course have come to the user's attention. When no warning is given to the plaintiff, he is entitled to the benefit of a presumption that an adequate warning, if given, would have been read and heeded.

"A duty to warn of dangers inherent in the use of a product exists only when the persons to whom the warning would be given can reasonably be assumed to be ignorant of the facts or dangers which a warning would communicate. If it is reasonable to assume that such persons are not ignorant of those facts, there is no duty to warn. *Where the danger* or potential for danger inherent in the use of a product *is known or should be known to the user, the law imposes no duty to warn.*" [Emphasis added.]

"FAILURE TO WARN—DISTINCTION BETWEEN A NEGLIGENT FAILURE TO WARN AND AN ADEQUATE WARNING FOR STRICT LIABILITY IN TORT PURPOSES

"In this case, Plaintiffs claim that the Defendant G & G Mfg. Co., Inc., was negligent by reason of manufacturing and marketing a power take-off drive shaft. Plaintiffs claim that the PTO shaft and auger did not contain adequate warnings relative to maximum extension and operating speed of the power take-off drive shaft. Plaintiffs maintain that the failure to so warn rendered the PTO shaft and auger defective and unreasonably dangerous under a strict liability in tort theory.

"You are instructed that there is an important distinction between an alleged negligent failure to warn and the warning requirements for strict liability in tort purposes. Under a negligence theory, the issue is whether or not the conduct of the manufacturer in providing a certain warning with its product, or in providing no warning at all, fell below the standard of reasonable care. However, under a strict liability in tort theory, the focus is on the product and not the defendant's conduct. The question, therefore, is whether or not the warnings, if any, were adequate to render the product not unreasonably dangerous to the ordinary user of it.

"*A duty to warn* of dangers inherent in the use of a product *arises only if:*

"(1) The product would be considered defective and unreasonably dangerous without such warning;

"(2) The fact that the product would be considered defective and unreasonably dangerous in the absence of such a warning is or should be known to the manufacturer or seller of that product; and

"(3) *The danger to be warned of is not one that is obvious* or known to or readily discoverable by a person who might reasonably be expected to use the product, and is not a danger which arises only because the product is put to some unexpected use." [Emphasis added.]

is unreasonably dangerous. However, that statement must be read in the context of our specific holding in *Oanes* that a jury instruction on alteration or modification of a product without regard to foreseeability was reversible error. In addressing other jury instructions which were likely to arise on retrial, we were in a unique position of correcting isolated language in instructions which, standing alone, was erroneous. We specifically noted that "[b]ecause we have reversed and remanded for a new trial on another issue, we express no opinion on whether the trial court's other instructions cured ... any other instruction which, standing alone, was erroneous." *Oanes, supra,* 476 N.W.2d at 253, n. 7.

Because we find no other reversible error in this case, we consider the isolated phrases about no duty to warn of obvious dangers in the context of the instructions as a whole. The entire instruction on a "Manufacturer's Duty to Warn" imposed "a duty to give a reasonable warning as to dangers inherent or reasonably foreseeable" which "would cause an individual of ordinary prudence to exercise for his own safety caution commensurate with the potential danger in the designed or anticipated use." See fn. 3. The instruction on ordinary negligence also described the duty to use ordinary care. The instruction on the distinction between negligent failure to warn and an adequate warning for strict liability accentuated the distinction between negligent failure to warn and the warning requirements for strict liability in tort. See fn. 3. The jury also was instructed that, in determining if a defective product was "unreasonably dangerous," it could consider the characteristics and propensities of the product, along with any actual knowledge, training, or experience

of the user. See fn. 2. The definitions of "defective product" and "unreasonably dangerous" allowed the jury to consider several factors in determining whether the product was unreasonably dangerous including "the obviousness of the danger." See fn. 2.

We believe these instructions, when considered as a whole, fairly and adequately apprised the jury that knowledge of the user and obviousness of the danger are factors to be considered in the ultimate determination of whether the product was defective and unreasonably dangerous. In this context we do not believe the isolated phrases about no duty to warn of obvious dangers constitute reversible error.

■ The Spiekers next argue that the trial court erred in refusing to give their requested jury instructions regarding "state of the art" and "custom and practice in the industry." [4] At trial, G & G presented evidence that the design of the PTO complied with the state of the art when it was manufactured in 1978. G & G also presented evidence that manufacturers were not using "pin-stops" to limit maximum extension of PTOs in 1978. Relying upon *Olson v. A. W. Chesterton Co., supra,* the Spiekers assert that their requested instructions would have advised the jury that the evidence on state of the art or custom and practice in the industry could be considered only for their negligence claim and could not be considered in determining whether or not the PTO was defective. In *Olson v. A. W. Chesterton Co.,* 256 N.W.2d at 540, we said that state of the art "evidence in actions predicated upon strict liability possesses even less probative value [than in actions based upon negligence],

**4.** The Spiekers' requested instructions provided:
"STATE OF THE ART
"In determining whether a product is defective for the purpose of strict liability, you are instructed that it is no defense for the manufacturer or the dealer to prove that the product was within the state of the art at the time of its manufacture or design."
"CUSTOM AND PRACTICE IN THE INDUSTRY
"The custom and practice in the industry may be considered by you, relative to the

issue(s) of negligence in this case, but should not be considered by you relative to the issue(s) of strict liability. Evidence that the standard custom and practice may have been followed by a manufacturer is not conclusive when you are determining whether the manufacturer exercised reasonable care. Rather, the fact that industry custom and practice may have been followed is merely evidence to be considered when determining whether conduct is negligent."

and under the facts of this case exclusion of that evidence by the trial court was not an abuse of discretion and does not constitute prejudicial or reversible error." Spiekers also contend that the trial court erred in refusing to give their requested instructions on industry standards.[5] They argue that the jury may have found G & G negligent if it had been properly instructed that a violation of industry standards is evidence of negligence.

▪▪▪ A trial court need not give instructions in the specific language requested by a party as long as the instructions given fairly and adequately inform the jury of the applicable law. E.g., *Erickson v. Schwan*, 453 N.W.2d 765 (N.D.1990). A party is entitled to instructions which present that party's theory of the case if justified by the applicable law, the evidence and the pleadings. *Johanson v. Nash Finch Company*, 216 N.W.2d 271 (N.D. 1974). But when the instructions adequately apprise the jury on the party's theory of the case, we reject a concept that requires the trial court to include in the instructions statements and comments that are more argumentative than instructive and are better left for the summations by counsel.

Here, the court instructed the jury that the "rule of strict liability applies even though [G & G] exercised all possible care in the manufacture and sale of the product" and that "under a strict liability in tort theory, the focus is on the product and not the defendant's conduct." The court further instructed the jury that in order to prevail on their strict liability claim the Spiekers must prove by the greater weight of the evidence that the PTO was in a defective condition which rendered it unreasonably dangerous. The court also instructed the jury on the definition of "defective product" and "unreasonably dangerous." See fn. 2. These instructions informed the jury of factors to be considered in determining whether or not the PTO was defective and unreasonably dangerous under the Spiekers' strict liability claim. Additionally, the trial court's instructions on ordinary negligence and duty to use reasonable care did not preclude the Spiekers from arguing that custom and practice in the industry were not conclusive in determining whether a manufacturer exercised reasonable care and that violations of industry standards may be evidence of negligence. The instructions, when read as a whole, fairly and adequately advised the jury on these issues, and the trial court's failure to give the requested instructions was not erroneous.

▪▪▪ The Spiekers argue that the trial court erred in instructing the jury that an inference of no defect arises when a product is used for an extended time.[6] Relying upon *Air Heaters, Inc. v. Johnson Electric, Inc.*, 258 N.W.2d 649 (N.D.1977), they assert that the instruction was erroneously worded in mandatory rather than permissive terms and was incomplete because it did not state how the inference could be overcome.

5. The Spiekers' requested instruction provided:
   "RELEVANCE OF INDUSTRY SAFETY CODES OR STANDARDS
   "In this case, several codes and/or standards promulgated by the American Society of Agricultural Engineers have been admitted into evidence. You are instructed that the American Society of Agricultural Engineers is a voluntary organization of professional engineers and is not a governmental agency or entity. Therefore, a violation of the design standards published by the American Society of Agricultural Engineers that pertain to the design of portable grain augers, may be considered by you as evidence of negligence or as evidence of a defect in the portable grain auger in issue, but should not be considered

   by you as conclusively establishing that defendant, G & G Mfg. Co., Inc. or Westgo, Inc., were negligent in the design of the power take-off drive shaft or grain auger in issue, or that the power take-off drive shaft or grain auger was defective in design."

6. The instruction provided:
   "INFERENCE OF NO DEFECT FROM EXTENDED USE
   "The normal use of a product for an extended period of time with no problems raises an inference that the product was reasonably fit for its intended use and not in an unreasonably dangerous or defective condition at the time the manufacturer or seller parted with possession of it."

In *Air Heaters, Inc., supra,* the manufacturer of an electric system argued that a lapse of three years from the date of installation of the electrical system to the date of a fire raised an inference that the electrical system was fit for its intended use. We said that "an extended use of a product with no problems may raise an inference that there was no defect present at the time the item was purchased. But that inference is not conclusive and can be overcome by proof of a latent defect existing at the time of purchase or installation which with use, ultimately is disclosed." *Air Heaters, Inc., supra,* 258 N.W.2d at 655. However, in that case we concluded that there was evidence from which the trial court, as the trier-of-fact, could determine that the inference of fitness had been overcome, and we held that the trial court's finding that the fire was caused by a defect in the electrical system was not clearly erroneous.

*Air Heaters, Inc.* did not involve the propriety of a jury instruction. In *Besette v. Enderlin School Dist. No. 22,* 310 N.W.2d 759 (N.D.1981), we reviewed an instruction similar to the one given in this case and we concluded that the instructions given, as a whole, fairly and adequately apprised the jury of the law. This language in this instruction is consistent with the instruction in *Besette.*

Moreover, although the jury was not specifically instructed on how the inference of no defect could be overcome, the jury was instructed that "[n]o product is considered to have a defect or to be in a defective condition, unless at the time the product was sold by the manufacturer, or other initial seller, there was a defect or defective condition in the product which made the product 'unreasonably dangerous.'" That instruction focused the inquiry on the condition of the product at the time it was sold. The jury was further instructed on

the definitions of "defective product" and "unreasonably dangerous." See fn. 2. We believe those instructions, when read as a whole, fairly and adequately advised the jury regarding the requisites for finding a product defective at the time it was sold.

■ The Spiekers also argue that isolated parts of the trial court's instructions on defective design gave undue influence to obligations not imposed by law because they advised the jury that

"1) manufacturers are not insurers of the safety of persons who use the product, 2) manufacturers are under no duty to make an accident-proof or fool-proof product, 3) manufacturers are not required by law to guarantee their products cannot be used in such a way to cause injury, 4) so long as a product is reasonably safe for its intended use, manufacturers have done all that the law requires, even though other possible designs might be safer, and 5) manufacturers have no legal duty to produce products incorporating only the ultimate in safety."

Although these statements may be considered more argumentative than instructive, when balanced with the remaining instructions concerning the duties and responsibilities of a manufacturer, we believe the instructions did not give undue influence to obligations not imposed by law as to require reversal of the verdict.

■ The Spiekers also contend there was no evidence that Douglas had any knowledge of, or voluntarily exposed himself to, an abnormal danger of the "whipping and twirling" of the PTO and the trial court therefore erred in instructing the jury on assumption of risk.[7]

Assumption of risk is a defense in a products liability action based upon strict liability in tort. *Mauch v. Manufacturers Sales & Service, Inc.,* 345 N.W.2d 338

---

7. The instruction on assumption of risk provided:

"ASSUMPTION OF RISK
"A person who assumes the risk of injury by voluntarily placing himself in a position to chance a known danger is not entitled to recover for any resulting injury. To find that

a person assumed the risk in this regard, you must find:
"1. That he had knowledge of the risk;
"2. That he appreciated the risk; and
"3. That he had a choice to avoid the risk or chance it and voluntarily chose to chance it."

(N.D.1984). In this case there was evidence that Douglas was familiar with this type of equipment and that he was aware that PTOs had to be set at proper angles and not overextended. Under these circumstances we believe there was evidence that Douglas was aware of, or voluntarily exposed himself to, an abnormal danger. Moreover, although Douglas may not have known about the specific abnormal danger of the "whipping and twirling" of the PTO, we believe the general dangers inherent in the use of a PTO with farm equipment are sufficient to justify instructing the jury on assumption of risk.

## ADMISSION OF EVIDENCE

██ The Spiekers contend that the trial court erred in allowing G & G to cross-examine their expert, John Sevart, concerning his definitions of "defective," "unreasonably dangerous," and "foreseeable." They argue that the cross-examination regarding these definitions constituted reversible error because it invaded the domain of the trial court to instruct the jury on the law.

On direct examination Sevart testified that the PTO was defective and unreasonably dangerous. He also testified about foreseeability and foreseeable misuse. On cross-examination Sevart acknowledged that his definitions of those terms were engineering definitions and not legal definitions. Under Rule 705, N.D.R.Ev.,[8] we believe that the cross-examination was proper to show the basis for Sevart's opinion. Moreover, the court instructed the jury on the legal definitions of those terms and on the duty to accept the law given in the court's instructions. The cross-examination of Sevart about his definitions of those terms did not constitute reversible error.

The Spiekers contend that the trial court erred in admitting evidence that Sevart and Jim Hawkins were not aware of any similar PTO failures because there was no foundation to establish that those witnesses would have known of any such failures.

On direct examination Sevart testified that he was familiar with the PTO model involved in this case; that he had investigated more than thirty PTO accidents involving farm machinery; and that he had presented technical papers on PTOs. Sevart opined that this PTO failed as a result of critical speed or vibration failure. On cross-examination by G & G, Sevart testified that he had never seen a PTO with similar pretzel-shaped damage; that prior to this case he had never seen a failure by this model PTO; and that he could not recall a vibration problem with this model PTO. The court concluded that there was proper foundation for the questions and that it was proper cross-examination. We believe the trial court properly exercised its discretion in allowing the cross-examination of Sevart in order to test the basis underlying his opinion.

██ On direct examination by G & G, Hawkins testified that he was in position at G & G to be aware of any complaints and that he did not recall a vibration problem brought to his attention with respect to this model PTO. The trial court ruled that there was adequate foundation for Hawkins's testimony. We conclude the trial court did not abuse its discretion in admitting the testimony.

The Spiekers also contend that the trial court erred in allowing Hawkins to testify concerning the state of the art relating to the manufacture and design of PTOs and the standardization in the manufacture of PTO components. They assert that Hawkins had not been disclosed as an expert during discovery.

██ The Spiekers had initially located and deposed Hawkins, a former employee of G & G. At trial, Hawkins testified on direct examination by G & G about his knowledge of the manufacture and standards applicable to this model PTO. In

8. Rule 705, N.D.R.Ev., provides:
"DISCLOSURE OF FACTS OR DATA UNDERLYING EXPERT OPINION
"The expert may testify in terms of opinion or inference and give reasons therefor without previous disclosure of the underlying facts or data, unless the court requires otherwise. The expert may in any event be required to disclose the underlying facts or data on cross-examination."

allowing Hawkins's testimony in his capacity as a former employee of G & G, the trial court noted that the Spiekers had sufficient notice and knowledge about Hawkins's background, training, and experience in his capacity as a G & G employee. The admission of this testimony was within the discretion of the trial court.

The Spiekers also contend that the trial court erred in allowing Dale Gumz to testify at trial concerning hazards associated with "pin-stops" for PTOs and about various measurements he had taken based upon an analysis of a photograph of the scene of the accident. They assert that those matters had not been disclosed before trial.

Gumz had been disclosed as an expert and, in his deposition, testified that the most likely cause of the accident was movement of the tractor. His measurements support that opinion and the Spiekers were informed before trial that the measurements confirmed that opinion. Moreover, counsel for the Spiekers acknowledged at trial that G & G had disclosed another witness that would testify about the hazards associated with "pin-stops." Under these circumstances, we do not believe the Spiekers' claim of surprise is meritorious and the trial court properly exercised its discretion in allowing this testimony by Gumz.

### BREACH OF WARRANTY

■ The Spiekers contend that the trial court erred in concluding that the four-year statute of limitations of Section 41–02–104, N.D.C.C.[9] [UCC § 2–725] applied to their breach of warranty claim. They assert that Section 41–02–104, N.D.C.C., only applies to parties in privity and does not apply to claims for breach of warranty resulting in personal injuries. They argue that Section 28–01–16(5), N.D.C.C., authorizes the commencement of their warranty action for personal injuries within six years after the date of the injury.

Section 41–02–35, N.D.C.C. [UCC § 2–318] provides that "[a] seller's warranty whether express or implied extends to any person who may reasonably be expected to use, consume or be affected by the goods and who is injured by breach of the warranty." That provision is intended to "give certain beneficiaries the benefit of the same warranty which the buyer received in the contract for sale, thereby freeing any such beneficiaries from any technical rules as to 'privity.'" Official Comment 2 to UCC § 2–318. The warranty provisions of the UCC therefore apply regardless of privity.

Section 41–02–94(2)(b), N.D.C.C. [UCC § 2–715], provides that "[c]onsequential damages resulting from the seller's breach [of warranty] include ... [i]njury to person or property proximately resulting from any breach of warranty." Section 41–02–98(3), N.D.C.C. [2–719], provides that "[c]onsequential damages may be limited or excluded unless the limitation or exclusion is unconscionable [and] [l]imitation of consequential damages for injury to the person in the case of consumer goods is prima facie unconscionable." Those statutory

---

9. At the time the PTO was sold, Section 41–02–104, N.D.C.C., provided:

"*41–02–104.* *(2–725) Statute of limitations in contracts for sale.*

"1. An action for breach of any contract for sale must be commenced within four years after the cause of action has accrued. By the original agreement the parties may reduce the period of limitation to not less than one year but may not extend it.

"2. A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach. A breach of warranty occurs when tender of delivery is made, except that where a warranty explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance the cause of action accrues when the breach is or should have been discovered.

"3. Where an action commenced within the time limited by subsection 1 is so terminated as to leave available a remedy by another action for the same breach such other action may be commenced after the expiration of the time limited and within six months after the termination of the first action unless the termination resulted from voluntary discontinuance or from dismissal for failure or neglect to prosecute.

"4. This section does not alter the law on tolling of the statute of limitations nor does it apply to causes of action which have accrued before this title becomes effective."

provisions allow recovery of damages for personal injuries for a breach of warranty.

Additionally, Section 28–01–16(1), N.D.C.C., requires an "action upon a contract, obligation, or liability, express or implied, *subject to the provisions of sections ... 41–02–104*" to be commenced within six years after a claim for relief has accrued. [Emphasis added.] That section specifically exempts the four-year statute of limitations in Section 41–02–104, N.D.C.C., from the six-year statute of limitations generally applicable to "action[s] upon a contract."

 Although the six-year statute of limitations applies to product liability actions based upon negligence or strict liability [*Erickson v. Scotsman, Inc.*, 456 N.W.2d 535 (N.D.1990)], we conclude that under our statutory scheme, Section 41–02–104, N.D.C.C., applies to breach of warranty claims involving transactions in goods which result in personal injuries to parties who are not in privity. The trial court did not err in determining that Section 41–02–104, N.D.C.C., applied to the Spiekers' breach of warranty claim.[10]

The judgment and the orders denying the Spiekers' post-trial motions are affirmed.

ERICKSTAD, C.J., concurs.

LEVINE, J., concurs in the result.

Justice GIERKE, a member of the Court when this case was heard, resigned effective November 20, 1991, to accept appointment to the United States Court of Military Appeals and did not participate in this decision.

MESCHKE, Justice, concurring.

Although these instructions are unusually (and undesirably) one-sided and argumentative, I reluctantly concur in today's result and much of the reasoning. I submit that the complexity, prolixity, and confusion implicit in these jury instructions continue to illustrate the need to combine and simplify strict liability and negligence

doctrine for submission to a jury, at least in the failure-to-warn context. *See* my concurrence and dissent in *Oanes v. Westgo, Inc.*, 476 N.W.2d 248 (N.D.1991) and Justice Levine's dissent in *Butz v. Werner*, 438 N.W.2d 509 (N.D.1989).

---

**10.** The Spiekers have not argued and we have not considered the issue of whether or not the discovery-rule exception of Section 41–02–104(2), N.D.C.C., is applicable to their breach of warranty claim. See *Hebron Public School v.* *U.S. Gypsum*, 475 N.W.2d 120 (N.D.1991). We do not consider issues neither raised nor briefed. *Olmstead v. First Interstate Bank*, 449 N.W.2d 804 (N.D.1989).