**AGGROW OILS, L.L.C., Plaintiff,**

v.

**NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA; Ibberson Engineering, Inc., and Anderson International Corporation, Defendants.**

**T.E. Ibberson Company, Plaintiff,**

v.

**Anderson International Corp., Defendant.**

**Nos. A3–99–26, A3–00–42.**

United States District Court, D. North Dakota, Southeastern Division.

July 14, 2003.

Craig Robert Campbell, Gunhus Grinnell Klinger Swenson & Guy, Moorhead, MN, for plaintiff.

Maurice G. McCormick, Vogel Weir Hunke & McCormick Ltd, Fargo, ND, Philip L. Bruner, Faegre & Benson, Marvin T. Fabyanske, Patrick J. Lee–O'Halloran, Fabyanske Westra & Hart PA, Minneapolis, MN, for defendant/cross-defendant, National Union Fire Insurance Company of Pittsburgh, PA.

Maurice G. McCormick, Vogel Weir Hunke & McCormick Ltd, Fargo, ND, Marvin T. Fabyanske, Patrick J. Lee–O'Halloran, Fabyanske Westra & Hart PA, Minneapolis, MN, for defendant/cross-claimant/cross-defendant, Ibberson Engineering, Inc.

Ronald H. McLean, Serkland, Lundberg, Erickson, Marcil & McLean, Ltd., Fargo, ND, Gregory V. Mersol, Thomas J. Piatak, Baker & Hostetler LLP, Cleveland, OH, for defendant/cross-defendant/cross-claimant, Anderson International Corp.

## MEMORANDUM AND ORDER

WEBB, District Judge.

### I. Introduction

The path that leads to this Order is a long and winding one. In 1996, AgGrow Oils, L.L.C. ("AgGrow") was formed for the purpose of building and operating an oilseed processing plant in Carrington, North Dakota. To that end, AgGrow entered into a contract with T.E. Ibberson Company ("Ibberson") on May 22, 1997, whereby Ibberson agreed to design and build the plant for a guaranteed maximum price of $7,758,281.00. The contract between AgGrow and Ibberson contemplated that Ibberson would purchase oilseed extraction equipment from Anderson International Corporation ("Anderson"), and the contract recited[1] the performance guarantees from Anderson that the completed plant would process 200 tons per day of five different types of oilseeds, with five to eight percent residual oil in the expeller cake.[2] The obligations of Ibberson to AgGrow under their contract were guaranteed by a performance bond from National Union Fire Insurance Company ("National"). The plant was completed in January 1998, but it performed at a lesser rate of

---

1. As explained herein, the parties disagree as to whether the contract merely recited Anderson's performance guarantees or, instead, whether the contract also independently bound Ibberson to AgGrow with regard to Anderson's guarantees.

2. Expeller cake is that which remains after the oil has been mechanically removed from the oil seed.

efficiency than was set forth in the performance guarantees. After several unsuccessful modifications by Ibberson and Anderson, AgGrow eventually ceased operation in January 1999, and it sold the plant in May 1999.

The failure of the plant spawned three separate actions. First, in February 1999, AgGrow sued National, Anderson, and Ibberson Engineering, a wholly-owned subsidiary of Ibberson that performed design and engineering services for the plant. AgGrow seeks relief under the bond as well as damages for bad faith from National. AgGrow's suit against Ibberson Engineering is for negligence. AgGrow alleges breach of warranty and negligence against Anderson. Ibberson Engineering cross claimed against Anderson for indemnity as to any liability to AgGrow. Anderson also cross claimed against Ibberson and National as to any liability to AgGrow.

The second action was Ibberson's arbitration proceeding against AgGrow pursuant to the mandatory arbitration provisions in their contract. AgGrow counterclaimed against Ibberson for damages. Third, Ibberson sued Anderson in the District of Minnesota for indemnity of any liability to AgGrow. That case was transferred to this Court and consolidated with AgGrow's case.

Shortly after AgGrow filed its case in this Court, National moved for a stay. Following a hearing, the Court determined that, contrary to National's position, a mandatory arbitration provision in AgGrow's contract with Ibberson did not encompass claims against National, and it denied the motion for a mandatory stay. The Court also denied a discretionary stay, in part because it understood that there was no arbitration pending between Ibberson and AgGrow. An appeal followed.

The Eighth Circuit remanded the case to this Court to consider whether or not a discretionary stay was appropriate because, in fact, there was pending arbitration between Ibberson and AgGrow. *See AgGrow Oils, L.L.C. v. National Union Fire Ins. Co.*, 242 F.3d 777, 783 (8th Cir. 2001).

Before the Court could take action pursuant to the Eighth Circuit mandate, the parties agreed to a global resolution of all issues and actions (save AgGrow's bad faith claim against National) by a panel of Special Masters pursuant to Rule 53 of the Federal Rules of Civil Procedure. The Special Masters, who are Jonathan H. Morgan, Allen L. Overcash, and United States Magistrate Judge Karen K. Klein, presided over nine days of testimony and evidence presentation. Thereafter, they issued a Report of the Special Masters, which contained their Findings of Fact and Conclusions of Law. (Doc. # 151.)

In short, the Masters concluded that: AgGrow was not responsible for any of the plant's failings; Ibberson, as prime contractor, assumed entire contractual responsibility for the deficient plant, and it is liable for breach of contract and breach of warranty damages for costs of corrective work and lost revenue and profits in the amount of $2,578,840.53; Ibberson is entitled to indemnity from Anderson in the amount of $900,794.20, the extent of Anderson's fault for the plant's failure; and National Union is jointly and severally liable with Ibberson for costs of corrective work in the amount of $1,138,950.53.

Each of the parties have submitted objections to the Report of the Special Masters. AgGrow asserts that National should be jointly and severally liable with Ibberson for all damages, including lost revenue and profits. Ibberson[3] disputes

---

**3.** Ibberson and National are represented by the same counsel, and they present a united

position. Thus, when the Court refers to Ibberson's position or argument, this *is* also

the Masters' determination of the extent of its obligations to AgGrow under its contract; it contends that the Masters erred in finding that Ibberson was responsible for the entire project, including any of Anderson's failings. Anderson claims that the Masters incorrectly determined that it was under a duty to cooperate in implementing performance guarantees. In any event, argues Anderson, Ibberson has no right of indemnity against it. National contends that it is not liable at all because its obligation to perform pursuant to the bond was not triggered. Both Ibberson and Anderson complain that AgGrow is at least somewhat responsible for the failed plant. Ibberson and Anderson also object to the measure of damages.

On April 11, 2003, the Court heard oral argument on these objections. The Court has given lengthy consideration to the memoranda submitted and arguments presented by the parties. Based upon the memoranda and arguments along with a review of the entire file, the Court modifies the Report in three respects, but otherwise, the Court adopts the Report in its entirety, as explained below.

## II. Analysis

■ The Court was initially of the view that it was to reverse the Masters' findings of fact that were clearly erroneous. Upon further research and upon closer examination of Rule 53(e) of the Federal Rules of Civil Procedure, the Court determines that the Masters' findings of fact are not reviewable at all because the parties stipulated to their finality. (Doc. # 94, ¶ 4.) Rule 53(e)(2) provides:

> In an action to be tried without a jury the court shall accept the master's findings of fact unless clearly erroneous.... The court after hearing may adopt the report or may modify it or may reject it in whole or in part or may receive fur-

ther evidence or may recommit it with instructions.

Rule 52(e)(3) sets forth the effect of a master's report in jury actions. Then, Rule 53(e)(4) provides:

> The effect of a master's report is the same whether or not the parties have consented to the reference; but, when the parties stipulate that a master's findings of fact shall be final, only questions of law arising upon the report shall thereafter be considered.

Reading 53(e)(2) together and consistently with 53(e)(4) reveals that, as a general rule, a court considers a master's findings of fact under a clearly erroneous standard. An exception to this general rule occurs when the parties stipulate to the master's findings of fact; in such case, the Court may only review conclusions of law. See *Gilbane Bldg. Co. v. Fed. Reserve Bank of Richmond,* 80 F.3d 895, 902 (4th Cir.1996) ("[S]pecial master's factual conclusions normally are reviewable for clear error. But they are unreviewable if the parties so stipulate ...." (citations omitted)); *see also* 9A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2614 (1995) (explaining that a clearly erroneous standard of review applies only in the absence of a stipulation regarding the finality of factual findings). Accordingly, the Court's review is only of the Masters' conclusions of law, and this review is *de novo. United States v. Lothridge,* 324 F.3d 599, 601 (8th Cir.2003).

The Court has already observed in an earlier order in this case that there is no question that the plant failed to meet its expectations. The overarching question resolved by the Masters was where the responsibility lies for this failure. Thus, the Court's review is most easily organized

National's position or argument, and vice versa.

according to the Masters' determination of responsibility as to each party.

### A. *AgGrow's Responsiblity*

Both Ibberson and Anderson challenge the Masters' conclusion that AgGrow bore no responsibility for the plant's deficient performance. In order for the performance guarantees to be activated, Anderson required that seed received by AgGrow for processing meet certain specifications. Ibberson and Anderson contend that the seed never met these specifications, contrary to the finding of the Masters (Report, Findings of Fact ¶ 23 ("The Special Masters find that the Anderson Hivex expander and Anderson expellers did not perform adequately to produce the guaranteed level for these oilseeds even when the oilseeds provided to the Anderson equipment were in substantial conformity with the stated specifications.").)

Ibberson further complains that AgGrow colluded with Anderson to withhold from Ibberson the results of a Texas A & M University study, which, according to Ibberson, would have shed light on the deficiencies of the Anderson equipment. The Masters found that there was no conspiracy to withhold results, and that, in any event, the study was "not applicable to the ultimate application on the project in this case." (Report, Findings of Fact ¶ 5.)

■ Despite Ibberson's and Anderson's efforts to characterize these attacks as issues of law and thus reviewable, the Court disagrees. The determinations of whether or not seeds were in conformity and whether or not a study was pertinent to the project at hand are purely factual. Indeed, these issues are precisely within the area of technical expertise for which two of the three Special Masters are especially qualified to answer. *Cf. Cronin v. Browner*, 90 F.Supp.2d 364, 378 (S.D.N.Y. 2000) (relying on a special master, in part because of his expertise). Since Ibberson

and Anderson dispute the Master's determination of AgGrow's responsibility on purely factual grounds, the Court adopts the findings of the Masters with regard to AgGrow's lack of responsibility for the failings of its plant. *See Rule* 53(e)(2), Rule 53(e)(4).

### B. *Ibberson's Responsibility*

The Special Masters found that Ibberson had all-encompassing responsibility for the design and construction of the plant. (Report, Findings of Fact ¶ 8 ("Ibberson assumed entire contractual responsibility for all equipment and guarantees, including the equipment and guarantees of Anderson.").) As such, the Masters concluded that "the guarantees provided by Anderson are not merely 'passed through' from Anderson through Ibberson to AgGrow, but that Anderson is fully bound to Ibberson on the guarantees just as Ibberson is fully bound to AgGrow." (Report, Findings of Fact ¶ 19.) While Ibberson assumed primary contractual responsibility, the Masters found that Ibberson has a right of indemnity against Anderson to the limited extent that Anderson's fault contributed to the plant's deficiencies.

### 1. *Scope of Contract*

Ibberson challenges the Master's determination that it had primary responsibility for the failure of the plant to achieve the performance guarantees; it argues in its Objections to the Special Masters Report that: "The only way to harmonize the guarantees in the Contract is to conclude that Anderson alone is responsible for the 200 TPD 5%–8% guarantee." (Ibberson Objections, Doc. # 154 at 6.) Interestingly, Ibberson was singing a different tune in its demand for arbitration against AgGrow, wherein Ibberson acknowledged:

Under the Construction Contract, T.E. Ibberson guaranteed that the Facility

would process 200 tons of seed per day and that the residual oil content of the crushed seed would be 5–8% (the "Performance Guarantees."). T.E. Ibberson, in turn, received these same Performance Guarantees from Anderson International Corp. ("Anderson"), the designated subcontractor responsible for furnishing the oil extraction equipment (the "Equipment").(Demand for Arbitration, Statement of Claim & para; 2.) In its Complaint against Anderson, Ibberson again averred that it was independently bound to AgGrow for the achievement of the performance guarantees: "T.E. Ibberson received the same Performance Guarantees from Anderson that T.E. Ibberson gave to AgGrow." (Complaint, A3–00–42, Doc. # 1 ¶ 11.)

■ At least one court has held that a party is bound by its assertions in its pleadings regarding the terms of a disputed contract; subsequent contradictory assertions are precluded pursuant to the judicial admissions doctrine. *See Cananwill, Inc. v. EMAR Group, Inc.*, 250 B.R. 533, 544 (M.D.N.C.1999). "[J]udicial efficiency demands that a party not be allowed to controvert what it has already unequivocally told a court by the most formal and considered means possible." *National Sur. Corp. v. Ranger Ins. Co.*, 260 F.3d 881, 886 (8th Cir.2001) (citation omitted). Ibberson's most recent assertion that Anderson alone is responsible for the performance guarantees is contradicted by its earlier representations that Ibberson contracted with AgGrow to provide a plant that achieved certain performance levels. Thus, pursuant to the judicial admissions doctrine, Ibberson is foreclosed from arguing that the guarantees merely passed through it to AgGrow. *Cananwill*, 250 B.R. at 544.

■ Not only is Ibberson's present argument foreclosed by the judicial admissions doctrine, it is also not supported by the language of its contract. "The construction of a written contract to determine its legal effect is a question of law for the court to decide[.]" *Kondrad ex rel. McPhail v. Bismarck Park Dist.*, 655 N.W.2d 411, 413 (N.D.2003). In performing this task, the Court is guided by the principle that "every clause, sentence, and provision should be given effect consistent with the main purpose of the contract." *U.S. Bank v. Koenig*, 650 N.W.2d 820, 823 (N.D.2002). The agreement between AgGrow Oils and T.E. Ibberson Company describes its main purpose in Article 2, which sets forth the work to be performed under the contract as: "The design and construction of a new multiple oilseed processing facility[.]" In other words, as explained by AgGrow at the hearing on this matter, the contract was design-to-build; it integrated the design and construction phases of the project into a single contract.

■ A reading of the entire contract consistent with its design-to-build purpose, reveals that Ibberson assumed primary responsibility for the entire plant package (including design services, materials, equipment, and construction), regardless of the entity that actually provided the services, materials, and equipment or performed the construction. Article 2 provides that Ibberson would design and construct the plant in accordance with the contract documents listed in Section 16.1.7. This section incorporates into the contract several other documents, including AIA Document A201 "General Conditions of the Contract for Construction, 1987 edition," which is a standard form document used in construction contracts. Paragraph 3.5.1 of these General Conditions provides the following warranty from Ibberson to AgGrow:

The Contractor warrants to the Owner ... that materials and equipment fur-

nished under the Contract will be of good quality and new unless otherwise required or permitted by the Contract Documents, that the Work will be free from defects not inherent in the quality required or permitted, and that the Work will conform with the requirements of the Contract Documents.[4]

While this provision sets forth three separate warranties, each pregnant with meaning, the Court will concentrate on the last one: "[T]he Work will conform with the requirements of the Contract Documents." This warranty begs the following questions: What constitutes "work"? And, what are the requirements of the Contract Documents? These questions are readily answered in the Contract and its incorporated documents. The term "work" encompasses "construction and services required by the Contract documents" as well as "all other labor, materials, equipment and services provided or to be provided by the Contractor to fulfill the Contractor's obligations." (General Conditions ¶ 1.1.3.) Thus, Ibberson warranted that all construction, services, labor, materials and equipment used in the design and construction of the oilseed facility would conform with the requirements of the contract documents.

The requirements of the contract documents are set forth in the "Specifications." (See General Conditions ¶ 1.1.6 ("The Specifications are that portion of the Con-

tract Documents consisting of the written requirements for materials, equipment, construction systems, standards and workmanship for the Work, and performance of related services.").) The main body of the Contract indicates that the Specifications are set forth in Appendix 2. Appendix 2, in turn, sets forth Anderson's Technical Specifications and Production Guarantees, which includes the 200 TPD 5%–8% guarantee. Thus, the main body of the document endorses by reference the Anderson Production Guarantees as the "Specifications" for the completion of the contract. Although the production guarantees are set forth under the rubric of Anderson's equipment, the contract makes clear that it really did not matter who provided any of the equipment as long as it met "the design performance specified." (Appendix 2, Scope of Work, ¶ G(1).) Because the provider of the equipment is essentially irrelevant, it becomes obvious that Ibberson independently guaranteed to AgGrow that the plant would perform at the level set forth in the performance guarantees. Accordingly, the Masters' conclusion that Ibberson, as the design-to-build contractor, is ultimately responsible for the entire plant package is consonant with the contract language, and the Court adopts this conclusion because it is correct as a matter of law.

---

4. Ibberson contends that this warranty is limited to one year because of a provision in the scope of work section of the contract that provides that Ibberson will:

Guarantee material and workmanship in the various structures for a period of one (1) year from the date of substantial completion and shall replace or repair defective material or workmanship that may develop within that period of time without expense to [AgGrow]. However,

[C]ourts have almost uniformly [held] that the typical one-year guaranty clause is not an

exclusive remedy, but rather it is "an added guaranty, to extend rather than limit the Contractor's liability for faulty construction." ... [T]he owner may, concurrently, have another remedy against the contractor for breach of the contract or breach of his express warranty obligation. James M. Lord, *Five Things Every Attorney Should Consider Before Approving Construction Contracts for Owners, Developers or Lenders,* 7 Construction Law 5, 8 (Jan. 1987) (citing cases); *accord Riverfront Lofts Condominium Owners Ass'n v. Milwaukee/Riverfront Properties Ltd. P'ship,* 236 F.Supp.2d 918, 941 (E.D.Wis.2002) (citing cases).

## 2. *Extent of Anderson's Duty to Indemnify*

While the Masters determined that Ibberson was ultimately responsible for the plant's deficiencies, they concluded that Ibberson was entitled to indemnity from Anderson for costs of corrective work and lost revenue to the limited extent that Anderson contributed to the failure of the plant. Ibberson challenges the Special Masters finding that its right of indemnity against Anderson is limited. Ibberson places the blame squarely on the shoulders of Anderson; it argues that the problem with the plant stemmed solely from the failure of the Anderson equipment to meet the guarantees. The Masters allocated responsibility between Anderson and Ibberson because they determined that the plant's failure to meet the guarantees was based on Anderson's faulty equipment and unsuccessful corrective efforts as well as deficiencies in the design and construction of the plant as a whole. (Report, Findings of Fact ¶ 23.) This is a factual determination, and it is therefore adopted by this Court. Fed.R.Civ.P. 53(e)(4).

## C. *Anderson's Responsibility*

The Masters found that Anderson contributed to the failure of the plant in two respects: (1) Anderson's equipment was deficient; and (2) Anderson failed to cooperate with Ibberson to ensure that Anderson's equipment met the performance guarantees. (Report, Findings of Fact ¶ 23.) The Masters concluded that under the terms of its contract, Anderson was required to indemnify Ibberson to the extent that Anderson's shortcomings led to the failure of the plant. The Masters determined, however, that Anderson was not liable to AgGrow, stating that the economic loss doctrine and the lack of privity between the two precluded direct liability.

## 1. *Terms of Ibberson and Anderson Contract*

On February 4, 1997, Anderson submitted to Ibberson a proposal to sell equipment. The proposal contained a guarantee that the Anderson equipment could process 200 tons per day of five different types of oilseeds, with five to eight percent residual oil in the expeller cake. Also included in the proposal were standard terms and conditions, one of which provided that "Purchaser [Ibberson] agrees to indemnify the Company [Anderson] against all claims arising out of or resulting from the operation use of the equipment."

Ibberson responded to the proposal on February 5, 1997 with a purchase order. Ibberson's purchase order stated: "Acceptance of this order is expressly limited to the terms and conditions of the order, see reverse side for additional terms and conditions." Ibberson's order also included an indemnification term:

Vendor [Anderson] agrees to defend, indemnify and hold harmless the Purchaser [Ibberson] and/or its customers and assigns against any and all liabilities, loss and expense (including attorney's fees) by reason of any claim action or litigation arising out of failure of the material supplied to meet specification or be otherwise defective and/or from any alleged or actual, direct or contributory infringement or patent, arising from the purchase, use or sale of subject material.

On February 6, 1997, Anderson sent Ibberson an invoice along with a revision of its original proposal; the letter accompanying these documents indicated that the revisions to the proposal were "per our meeting in your office, Friday, January 31, 1997." No other proposals or purchase orders were exchanged.

Ibberson and Anderson do not dispute that a contract between them was formed;

instead, they disagree as to the contract's terms. Ibberson argues that the terms of its purchase agreement control. Anderson, on the other hand, contends that it did not assent to the terms in Ibberson's purchase order. Because it did not assent, Anderson argues no contract was formed from the exchange of documents; rather, the performance of the parties established a contract.

As an initial matter, then, the Court must determine when a contract was formed by examining the contents of the writings exchanged. Under traditional contract law, the "mirror image" rule requires an offer to be accepted exactly as proposed in order to form a contract; otherwise, any deviation in the response merely constitutes a counteroffer. *Cooke v. Blood Systems, Inc.*, 320 N.W.2d 124, 128 (N.D.1982). If, after receiving a counteroffer, the offeror nonetheless performed, then he was deemed to have accepted the terms of the counteroffer. *Princess Cruises, Inc. v. General Elec. Co.*, 143 F.3d 828, 834 (4th Cir.1998); *Step–Saver Data Sys., Inc. v. Wyse Tech.*, 939 F.2d 91, 99 (3d Cir.1991). "This rigid requirement led to an unfortunate practice whereby commercial dealings too often degenerated into a 'battle of the forms' in which the merchant sending the last written communication before performance would reap the spoils of the battle by having the 'last shot' at inserting favorable boilerplate terms." *Superior Boiler Works, Inc. v. R.J. Sanders, Inc.*, 711 A.2d 628, 633 (R.I.1998).

 The adoption of the Uniform Commercial Code ("UCC") changed this practice with regard to the sale of goods between merchants. Now, in cases governed by the UCC, a contract may be formed even if the acceptance states additional or different terms. *See* N.D. Cent.Code § 41–02–14. The UCC applies to the Anderson/Ibberson transaction, where the primary thrust was the transaction involving a sale of goods. *See Air Heaters, Inc. v. Johnson Elec., Inc.*, 258 N.W.2d 649, 652 (N.D.1977) (holding that when a contract involves both goods and services, a court applies the UCC if the predominate thrust of the contract is the sale of goods).

North Dakota has adopted section 2–207 of the UCC, which provides rules for contract interpretation when parties exchange conflicting forms.[5]

 As set forth in the first subsection of section 2–207, an acceptance will constitute a counteroffer in instances where "acceptance is expressly made conditional on

---

5. Section 2–207 is codified at section 41–02–14 of the North Dakota Century Code, and its full text is as follows:
 1. A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.
 2. The additional terms are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract unless:
 a. The offer expressly limits acceptance to the terms of the offer;

 b. They materially alter it; or
 c. Notification of objection to them has already been given or is given within a reasonable time after notice of them is received.
 3. Conduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract. In such case the terms of the particular contract consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions of this title.

assent to the additional or different terms." N.D. Cent.Code § 41–02–14(1); *see also PCS Nitrogen Fertilizer, L.P. v. Christy Refractories, L.L.C.*, 225 F.3d 974, 979 (8th Cir.2000). This is exactly what happened here. Anderson submitted an offer by its proposal of February 4, 1997. *Cf. White Consol. Industries, Inc. v. McGill Mfg. Co., Inc.*, 165 F.3d 1185, 1190 (8th Cir.1999) (finding that a price quotation was an offer because "[i]t was sufficiently detailed and indicated that acceptance was all that was needed to ripen the offer into a contract"). Ibberson's responsive purchase order essentially parrots the language of the "counter-proviso" of the UCC, N.D. Cent.Code § 41–02–14(1). Ibberson's purchase order states: "Acceptance of this order is expressly limited to the terms and conditions of the order, see reverse side for additional terms and conditions." Thus, Ibberson's purchase order constitutes a counteroffer. N.D. Cent. Code § 41–02–14(1); *PCS Nitrogen Fertilizer*, 225 F.3d at 979; *White Consol. Industries, Inc.*, 165 F.3d at 1191.

■ If a counteroffer is accepted, a contract is formed and the additional and/or different terms become a part of the contract. *PCS Nitrogen Fertilizer*, 225 F.3d at 979–80. An acceptance of a counteroffer pursuant to the "counter-proviso" requires "specific and affirmative assent" to the terms of the counteroffer. *Id.* at 980. Here, Anderson did not give affirmative acceptance of Ibberson's counteroffer. Instead, on February 6, 1997, one day after Ibberson sent its purchase order, Anderson sent back its original proposal, with minor modifications made pursuant to a January 31, 1997 meeting. The proposal contained a provision similar to Ibberson's that provided that a contract would be formed only when Ibberson either accepted the proposal or incorporated the pro-

posal into its purchase order: "In either event, any proposal shall constitute the complete and exclusive statement of the terms of the contract between the parties [and any modifications could only be made] by written instrument executed by the authorized representatives of both parties." (Anderson Standard Terms and Conditions ¶ 1.) The only mention made of Ibberson's purchase order is the "Re" entry:

Re:AgGrow Oils Project
Your P.O. # 21552

This reference in the subject line, by itself, cannot constitute the "specific and affirmative assent" required to accept the terms of a counteroffer, and no contract was formed from the exchange of written documents. *Cf. White Consol. Industries, Inc.*, 165 F.3d at 1190; *Hays v. General Elec. Co.*, 151 F.Supp.2d 1001, 1009 (N.D.Ill. 2001) (holding that the return of an invoice with counter-proviso language cannot constitute acceptance of a counteroffer).

Even though the parties' written documents did not establish a contract, "[c]onduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale[.]" N.D. Cent. Code § 41–02–14(3). Anderson provided the equipment to Ibberson. Ibberson accepted the equipment and paid for it. This conduct supports the acknowledgment of the existence of a contract. *See PCS Nitrogen Fertilizer*, 225 F.3d at 981 (finding that acceptance and payment of goods establishes a contract). Therefore, the terms of each contract "consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provision" of the UCC. N.D. Cent.Code § 41–02–14(3). Accordingly, the contract does not include either Anderson's or Ibberson's indemnity provisions because they do not agree.[6]

6. Ibberson's request for attorney's fees must be denied because such request was made

pursuant to its proffered indemnity provision, which is not part of the contract.

This does not necessarily abrogate Anderson's liability, however, because the contract includes the production guarantees, which were agreed to in both the Anderson proposal and the Ibberson purchase order. "Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise." N.D. Cent.Code § 41–02–30. The production guarantees clearly fall within this definition. Thus, to the extent that Anderson contributed to the failure of the plant to meet the production guarantees, it is liable for breach of warranty damages, including consequential damages. N.D. Cent.Code § 41–02–93.

Anderson argues, however, that the Masters erroneously predicated their determination of Anderson's liability on a failed "duty to cooperate," a duty that Anderson argues it did not assume. In other words, Anderson asserts that it was merely a vendor of goods with no attendant duty to provide services to implement its guarantees. In support of this assertion, Anderson cites *A.T. Kearney, Inc. v. International Business Machines Corp.*, 73 F.3d 238 (9th Cir.1995), a case in which the Ninth Circuit determined that a seller of sophisticated computer equipment does not assume a duty of care to provide assistance and support that exists independent of the terms of the contract. *Id.* at 243. Kearney is readily distinguishable from the case at hand, however, because Anderson assumed a duty to cooperate under its contract with Ibberson.

■ Anderson, in the performance guarantee portion of its February 4 proposal, guaranteed that it would provide assistance and support under the following conditions:

If, due to the Seller's responsibility, the performance test cannot reach one item

or several items stipulated in the present contract, the Seller shall take effective measures to reach the different guarantee indices and shall bear the costs of freight, replacement or repairing, and Seller's technical personnel if required.

In its responding purchase order, Ibberson objected to the AIC "Standard Terms and Conditions," but it did not disagree with the provisions set forth in the performance guarantees. Thus, the Court concludes that the writings of the parties agree that Anderson was required to "take effective measures to reach the different guarantee indices" in the event that Anderson was responsible for the failure to meet the guarantees. Because the writings of the parties agree on this provision, it is a part of their contract. N.D. Cent.Code § 41–02–14(3). The provision was triggered because the Masters concluded that "the Anderson Hivex expander and Anderson expellers did not perform adequately to produce the guaranteed levels for these oilseeds even when the oilseeds provided to the Anderson equipment were in substantial conformity with the stated specification." The Masters therefore did not err in determining that Anderson was required to cooperate in implementing the performance of its guarantees. Accordingly, the Masters' factual conclusion that Anderson breached its contract with Ibberson—both by providing deficient equipment and by failing to cooperate with Ibberson to take effective measures to reach the performance guarantee—rests on solid legal ground, and it is adopted by this Court.

2. *Anderson's Altered Equipment Argument*

■ Anderson seeks to escape liability by contending that Ibberson replaced Anderson's expeller shafts without Anderson's knowledge, and, further, that

instead of installing a preconditioner, as urged by Anderson, Ibberson welded parts onto the Anderson expellers. These alterations abrogate its liability, asserts Anderson. The Report reflects the Masters' consideration of this argument. (Report, Findings of Fact ¶¶ 20–21.) Notwithstanding these alterations, the Masters found that Anderson's equipment and Anderson's failure to assist in the implementation of the guarantees contributed to the failure of the plant. This is a factual finding, and it is adopted by the Court.

### 3. *Direct Liability to AgGrow*

■■■■■ Ibberson disputes the Masters' conclusion that Anderson cannot be directly liable to AgGrow. The Masters foreclosed direct liability in part by relying on the economic loss doctrine, which has been adopted in North Dakota. The doctrine precludes tort claims for defective products when only economic damages result. *Clarys v. Ford Motor Co.,* 592 N.W.2d 573, 578–79 (N.D.1999). This rule responds to the distinct protections offered by contract law and tort law:

> Tort liability protects a consumer's interest in freedom from injury regardless of the existence of an agreement between the parties. Underlying tort liability is the recognition that buyers and sellers of consumer products are generally in an unequal bargaining position and courts may desire to provide protection for the public from unsafe products beyond that provided by contract law. Tort law imposes responsibility on manufacturers of defective products because they are best able to encourage safer manufacture and design and to allocate the costs of injury arising from unsafe products. A contractual duty arises from society's interest in the performance of promises and has been traditionally concerned with the fulfillment of reasonable economic expectations.

Society's need to spread losses is substantially lessened in commercial transactions where damage is to only the product itself, because those losses essentially relate to the benefit of the bargain between business entities. That loss is most frequently measured by the cost of repairs, the difference in the value of the product, or consequential damages attributable to the failure of the product to perform as expected. Those losses are based upon, and flow from, the purchaser's loss of the benefit of the contractual bargain and are the type for which a warranty action provides redress. *Coop. Power Ass'n v. Westinghouse Elec. Corp.,* 493 N.W.2d 661, 664 (N.D.1992). AgGrow's claims against Anderson are for negligence and breach of warranty for which AgGrow seeks economic damages (Complaint, A3–99–26 ¶¶ 72, 77, 82, 89); AgGrow does not allege that defective Anderson equipment caused injury to persons or other property. Thus, AgGrow's negligence claim is barred by the economic loss doctrine. *Coop. Power Ass'n,* 493 N.W.2d at 666.

This conclusion leaves the warranty claims available to AgGrow. The Masters agreed with Anderson, however, that a lack of privity between it and AgGrow foreclosed the warranty claims. (Report, Conclusions of Law ¶ 4.) After lengthy consideration of this issue, the Court finds that the circumstances of this particular case dictate that Anderson is directly liable to AgGrow on the warranty claims.

It is true that "[t]he general rule is that privity of contract [between the plaintiff and defendant] is required in an action for breach of either express or implied warranty and that there is no privity between the original seller and a subsequent purchaser who is [not] a party to the original sale." *Windham at Carmel Mountain*

*Ranch Assn. v. Superior Court,* 109 Cal. App.4th 1162, 135 Cal.Rptr.2d 834 (June 17, 2003) (citations omitted). AgGrow was not a party to the original sale between Ibberson and Anderson, and so there is no privity between AgGrow and Anderson. *Id.*

Yet, the UCC has relaxed the strict privity requirements for breach of warranty claims. Section 2–318, Alternative C, of the UCC, which was adopted by North Dakota and codified at section 41–02–35 of the North Dakota Century Code, provides:

> A seller's warranty whether express or implied extends to any person who may reasonably be expected to use, consume, or be affected by the goods and who is injured by breach of the warranty. A seller may not exclude or limit the operation of this section with respect to injury to the person of an individual to whom the warranty extends.

The North Dakota Supreme Court has acknowledged that this provision "appl[ies] regardless of privity," and it therefore held that non-privity plaintiffs could recover personal injury damages on breach of warranty claims. *Spieker v. Westgo, Inc.,* 479 N.W.2d 837, 847–48 (N.D.1992). The North Dakota Supreme Court has left open the question as to whether a non-privity plaintiff may recover direct economic damages or consequential economic damages for a breach of warranty claim.

> ["Direct economic loss" is] damage flowing directly from insufficient product quality. Direct economic loss includes ordinary loss of bargain damages: the difference between the actual value of the goods accepted and the value they would have had if they had been as warranted. Courts will also frequently measure direct economic loss by the purchaser's cost of repair. "Consequen-

tial economic loss," on the other hand, encompasses all economic harm a purchaser suffers beyond direct economic loss as defined above. Thus, consequential economic loss includes loss of profits resulting from failure of the goods to function as warranted, loss of goodwill and loss of business reputation.

1 James J. White & Robert S. Summers, Uniform Commercial Code § 11–5, at 592–93 (4th ed.1995). The Masters found Anderson responsible for both direct economic losses (costs of corrective work) and consequential economic losses (reduced revenue). (Report, Findings of Fact ¶ 28, ¶ 30.) Courts disagree as to whether and to what extent economic losses · may be recovered by non-privity plaintiffs under the UCC.[7] White & Summers, *supra,* §§ 11–5, 11–6, at 592–97.

Fortunately, this Court need not resolve this conflict because it concludes that Ag-Grow is an intended third-party beneficiary of the warranty given to Ibberson by Anderson, and thus privity is satisfied. *Cf. In re Masonite Corp. Hardboard Siding Products Liability Litigation,* 21 F.Supp.2d 593, 599–600 (E.D.La.1998) ("Literal privity can be finessed by a proxy: direct beneficiary or third-party beneficiary status.")

 Under North Dakota law, a third party can enforce a contract, even though he is not a party to it, if the contracting parties intended the third party to be· benefitted therefrom. *Apache Corp. v. MDU Resources Group, Inc.,* 603 N.W.2d 891, 894 (N.D.1999). A third party who merely acquires benefit from a contract is not accorded third party beneficiary status. *Hellman v. Thiele,* 413 N.W.2d 321, 325 (N.D.1987). Instead, such status is bestowed when the intent of

---

**7.** The Court notes, however, that most courts agree that direct economic damages, such as costs of corrective work, are available for non-privity plaintiffs in cases in which there is a breach of an express warranty. White & Summers, *supra,* § 11–7 at 597.

the contracting parties to expressly benefit the third party is evidenced by the contract. *O'Connell v. Entertainment Enterprises, Inc.*, 317 N.W.2d 385, 388 (N.D. 1982). The front cover of Anderson's proposal indicates that the proposal is for the AgGrow Oils Project. Anderson's February 6, 1997 letter references the AgGrow Oils Project. Anderson's proposal contained a flow chart describing the planned operation of the AgGrow Oils plant. Thus, AgGrow Oils was not merely an incidental beneficiary who happened to be the end user of Anderson's equipment, and Anderson was not merely a remote seller. Rather, AgGrow was a contemplated third-party beneficiary of the contract between Ibberson and Anderson. Accordingly, AgGrow is entitled to directly enforce the performance guarantees contained in that contract. *Point East Condominium Owners' Ass'n v. Cedar House Associates*, 104 Ohio App.3d 704, 663 N.E.2d 343, 357 (1995) ("We find that plaintiff, as assignee of Cedar House, was in privity with Katz, as an intended third party beneficiary under the purchase order."); *Touchet Valley Grain Growers, Inc. v. Opp & Seibold General Constr., Inc.*, 119 Wash.2d 334, 831 P.2d 724, 731, 732 (1992) (holding that third party beneficiary status satisfied the privity requirements for express and implied warranty claims).

## D. *National's Responsibility*

The Masters determined that National's performance bond was properly invoked. As such, they found that National was liable to AgGrow for the costs of corrective work. The Masters declined to find National liable for lost revenue, reasoning that such damages accrued prior to the triggering of the bond. Both National and AgGrow challenge the decision of the Masters with regard to National's responsibility. National argues that the bond was not triggered, and thus National cannot be liable. AgGrow asserts that National should also be responsible for lost revenue.

## 1. *Triggering of Bond*

The Court must initially determine whether or not National's obligations under the bond were triggered. According to National, there are two impediments to its liability. First, National argues that Ibberson did not default on its contract. Second, National complains that AgGrow did not perform conditions precedent required for bond relief.

With respect to National's first argument, the Court generally agrees with National's analysis that a default is required before there can be recovery against the surety. Section 12.3 of the performance bond defines "Contractor Default" as "Failure of the Contractor ... to perform or otherwise to comply with the terms of the Construction Contract." The Court has already determined that Ibberson, as part of its contract performance, was required to ensure achievement of the production guarantees, but it failed to do so. Therefore, Ibberson was in default.

National argues, however, that default occurs only as defined in the provisions for "termination [of the construction contract] by the owner for cause", as set forth in section 14.2.1 of the construction contract:

> The Owner may terminate the Contract if the Contractor:
>
> .1 persistently or repeatedly refuses or fails to supply enough properly skilled workers or proper materials;
>
> .2 fails to make payment to Subcontractors for material or labor in accordance with the respective agreements between the Contractor and Subcontractors;
>
> .3 persistently disregards laws, ordinances, or rules, regulations or orders of a public authority having jurisdiction; or

.4 otherwise is guilty of substantial breach of a provision of the Contract Documents.

The only provision possibly applicable here, argues National, is the fourth one, that it was guilty of a substantial breach. But, continues National, no substantial breach could have occurred because Ag-Grow issued a Certificate of Substantial Completion on January 19, 1998, which certified that "construction is sufficiently complete, in accordance with the Contract Documents, so the Owner can occupy or utilize the Work or designated portions thereof for the use for which it is intended, as expressed in the Contract Documents." (Exh. 41.) National's logic is that a designation of "substantial completion" cannot occur if there is a material breach. Again, the Court agrees; this is a maxim in contract law. *See, e.g.,* 67 Am.Jur.2d § 505 at 763(2d ed. 1985) ("It is now a well-established rule that substantial performance of a contract will be sufficient to support recovery by the performing party, substantial performance being considered as performance in good faith and in compliance with the contract, except for minor and relatively unimportant deviations.")

▇▇▇ While the Court largely agrees with National's general propositions, it does not agree with the conclusion drawn by National: that the issuance of a Certificate of Substantial Completion completely forecloses bond recovery. The Court also does not agree that default is defined by the "termination for cause" provisions in the construction contract. As explained above, Contractor Default occurs when the Contractor fails to perform the contract or comply with its terms. (Performance Bond ¶ 12.3.) National bound itself to the terms and performance of the construction contract. (*Id.* ¶ 1.) Part of Ibberson's performance required that it be responsible for failure to comply with requirements of contract documents even after final pay-

ment was made. (Construction Contract ¶ 4.3.5.) Other courts agree that a surety's obligations under a performance bond do not end even though a substantial completion certificate issues or the owner accepts the project. *See, e.g., Hunters Pointe Partners Ltd. P'ship v. U.S. Fid. & Guar. Co.,* 194 Mich.App. 294, 486 N.W.2d 136, 138 (1992); *School Bd. of Pinellas County v. St. Paul Fire & Marine Ins. Co.,* 449 So.2d 872, 874 (Fla.Dist.Ct.App. 1984). If the Court accepted National's position, bonds would be rendered useless in cases such as this where the structure initially appears to be physically sound and ready to operate, but then it is later determined to be deficient. The Court rejects National's argument that the issuance of a certificate of substantial completion prohibits bond recovery.

National secondly argues that AgGrow failed to perform the conditions precedent necessary for bond recovery. The relevant facts with respect to this argument are as follows. On May 29, 1998, counsel for AgGrow sent National and Ibberson a letter indicating that AgGrow was considering declaring a contractor default. By the same letter, AgGrow requested a conference with Ibberson and National as required by Section 3.1 of the bond. The parties met, and they devised a plan to achieve the performance guarantees. The plan failed. Several months later, by letter of February 3, 1999, AgGrow informed National, Ibberson, and Anderson of its continuing claim of default. Counsel for National responded on February 9, 1999, and he advised that Ibberson had completed its work and that neither Ibberson nor the surety were liable for the failed guarantees. On February 17, 1999, AgGrow declared a contractor default.

Paragraph 3 of the Bond provides:
3. If there is no Owner default, the Surety's obligation under this Bond shall arise after:

3.1 The Owner has notified the Contractor and the Surety at its address described in Paragraph 10 below that the Owner is considering declaring a Contractor Default and has requested and attempted to arrange a conference with the Contractor and the Surety to be held not later than fifteen days after receipt of such notice to discuss methods of performing the Construction Contract. If the Owner, the Contractor and the Surety agree, the Contractor shall be allowed a reasonable time to perform the Construction Contract, but such an agreement shall not waive the Owner's right, if any, subsequently to declare a Contractor Default; and

3.2 The Owner has declared a Contractor Default and formally terminated the Contractor's right to complete the contract. Such Contractor Default shall not be declared earlier than twenty days after the Contractor and the Surety have received notice as provided in Subparagraph 3.1; and

3.3 The Owner has agreed to pay the Balance of the Contract Price to the Surety in accordance with the terms of the Construction Contract or to a contractor selected to perform the Construction Contract in accordance with the terms of the contract with the Owner.

National claims that while the Masters determined that AgGrow provided notice of default and an intent to terminate the contract, the requirements of 3.2 to formally terminate the contract and 3.3 to pay the balance of the contract remain unsatisfied. National therefore argues that its obligation to perform under the bond had not ripened because the provisions in paragraph 3 are conditions precedent to its performance.

 A performance bond is a contract; as such, the Court applies general contract principles when interpreting the bond's terms. *Bank of Brewton, Inc. v. International Fidelity Ins. Co.*, 827 So.2d 747, 752 (Ala.2002). "A condition precedent is a condition which is to be performed before some right dependent thereon accrues or some act dependent thereon is performed." *Wachter v. Gratech Co.*, 608 N.W.2d 279, 285 (N.D.2000). Put another way, "[b]efore a party can enforce conditional contract obligations, the party must perform those requisite conditions for which the party is responsible." *Id.* Whether a contract provision is a condition precedent "depends on the intention of the parties as deduced from the whole instrument." *Id.* Using this standard and interpreting identical bond language, the Alabama Supreme Court has determined that the requirements of paragraph 3 are conditions precedent to the surety's bond performance. *Bank of Brewton*, 827 So.2d at 752–54. The Court finds no reason to hold otherwise.

 Thus, it would initially seem as though AgGrow violated conditions precedent by failing to strictly adhere to the provisions of 3.2 and 3.3, thereby discharging National's duties under the performance bond. However, conditions precedent may be waived, "either expressly or by implication resulting from acts or conduct, by the party in whose favor they are made." *Wachter*, 608 N.W.2d at 285. A waiver occurs "where the other party has unequivocally declared by word or act that performance of the condition will not secure performance of the counterpromise." *Fargo Pub. Library v. City of Fargo Urban Renewal Agency*, 185 N.W.2d 500, 505 (N.D.1971). National's letter of February 9, 1999, is a resounding and unequivocal declaration that it had completed performance and was not liable under the bond:

> With respect to Ibberson's bonding company, your claim of default last June was

baseless, and your claim of continuing default is no better. Ibberson has completed its work. There is nothing left to perform. Neither Ibberson or its surety have any liability with respect to the fraudulently induced guarantees. Ag-Grow will have to look directly to Anderson for any relief it expects to obtain. Under these circumstances, any formal notice of termination or payment of the contract balance, would have been "futile" and a "useless formality." *Id.* Thus, AgGrow was excused from performing the conditions precedent, and the Court agrees with the Masters that the bond was triggered.

### 2. *Lost Revenue*

Although the Masters found Ibberson liable for damages both for costs of corrective work and lost revenue, the Masters determined that National was only liable for damages for costs of corrective work, reasoning that "National was not called upon to complete performance until after the damages for lost revenue had been incurred." (Report, Findings of Fact ¶ 33.) AgGrow objects, arguing that National should also be liable for lost revenue.

■ Generally, the rights and liabilities of a surety are coextensive with those of its principal. *See Gateway Communications, Inc. v. John R. Hess, Inc.*, 208 W.Va. 505, 541 S.E.2d 595, 599 (2000); *Granite Constr. Co. v. American Motorists Ins. Co.*, 29 Cal.App.4th 658, 34 Cal.Rptr.2d 835, 842 (Cal.Ct.App.1994). The Court has already determined that Ibberson is responsible for lost revenue. Thus, unless

the bond agreement specifically provides otherwise, National is also liable for lost revenue damages. *National Union Fire Ins. Co. v. D & L Constr. Co.*, 353 F.2d 169, 175 (8th Cir.1965) ("The surety's rights and liabilities, absent a specific contrary agreement, are measured by those of its principal.")

■ The Court therefore turns to the language of the bond agreement. Paragraph 6 of the bond sets forth three distinct categories of damages available to AgGrow because of Ibberson's default:

> To the limit of the amount of this Bond, but subject to commitment by the Owner of the Balance of the Contract Price to mitigation of costs and damages on the Construction Contract, the Surety is obligated without duplication for:
>
> 6.1 The responsibilities of the Contractor for correction of defective work and completion of the Construction Contract;
>
> 6.2 Additional legal, design professional and delay costs resulting from the Contractor's Default, and resulting from the actions or failure to act of the Surety under Paragraph 4; and
>
> 6.3 Liquidated damages, or if no liquidated damages are specified in the Construction Contract, actual damages caused by delayed performance or non-performance of the Contractor.

AgGrow's lost revenue was caused by Ibberson's failure to implement the performance guarantees. Accordingly, such damages fall within the purview of section 6.3. *See Int'l Fid. Insurance Co. v. County of Rockland*, 98 F.Supp.2d 400, 414 (S.D.N.Y. 2000) (holding that section 6.3 allows damages for loss of revenue).[8]

---

**8.** National argues that section 6.3 comes into play only when there is a delay in the construction or there is a complete work-stoppage, neither of which, it argues, occurred in this case. It is true that Ibberson completed construction of the oilseed processing facility, without delay and without a complete work-stoppage. But, as the adage goes, "a job half done is a job not done." Because the facility did not meet the contractually-promised production guarantees, it was essentially worthless to AgGrow, and AgGrow was precluded from using the facility in the manner contemplated by its contract with Ibberson. There-

■ The next issue is whether lost revenue may be recovered from a surety even though such damages were sustained prior to the date on which the surety was called upon to perform. It is axiomatic that a surety could never be liable for its own actions or omissions prior to the date upon which it was called to perform because there would be no actions for it to take and no performance for it to omit. However, paragraph six of the bond does not predicate the surety's liability upon its own actions or omissions. Rather, paragraph six "distinguishes between, on the one hand, those damages 'resulting from' (¶ 6.2) or 'caused by' (¶ 6.3) the actions or omissions of the *Contractor*, and, on the other hand, those resulting from the actions or omissions of the *Surety* (¶ 6.2)." *Int'l Fid. Ins. Co.*, 98 F.Supp.2d at 412. Damages caused by the actions of the contractor necessarily are sustained prior to the triggering of the bond because once the surety is called upon to perform, the contractor's obligation has been terminated or, as in this case, the surety has announced that the contractor's obligations are completed. Thus, to give effect to section 6.3 of the bond, which allows damages caused by the contractor alone, the Court must conclude that a surety is liable for lost revenue damages caused by the contractor and realized prior to the bond trigger date. The Court therefore rejects the Masters' legal conclusion and finds that National is obligated under the bond for the payment of lost revenue.

### E. *Measure of Damages*

All parties, with the exception of Ag-Grow, object to the measure of damages. Ibberson, National, and Anderson assert that the Masters erred in determining that AgGrow could recover lost revenue. Ib-

fore, the contract and the facility were never fully completed, and the Court finds that lost revenue damages are appropriately awarded

berson and National argue that the Masters wrongly awarded betterments to Ag-Grow.

### 1. *Lost Revenue*

■ For a breach of contract, North Dakota law "incorporates the notion that contract damages should give the non-breaching party the benefit of the bargain by awarding a sum of money that will put that person in as good a position as if the contract had been performed." *Wachter v. Gratech Co., Ltd.*, 608 N.W.2d 279, 286 (N.D.2000). AgGrow would have received the full benefit of its bargain by receiving a plant that worked, and, along with a functioning plant, it would have received some profit. *See Rumsfeld v. Applied Companies, Inc.*, 325 F.3d 1328, 1344 (Fed. Cir.2003) ("The leading authorities on contracts agree that the normal measure of damages includes lost profits.") Thus, lost profits are properly recovered if they are "reasonable and not speculative." *Leingang v. City of Mandan Weed Bd.*, 468 N.W.2d 397, 398 (N.D.1991). This standard is satisfied "[w]here a plaintiff offers evidence estimating anticipated profits with reasonable certainty." *Id.* AgGrow did offer such evidence. As reported by the Masters, AgGrow offered an expert that determined the lost revenue to be $1.5 million, and this amount was "consistent with AgGrow's contemporaneous determination of the amount of revenue and profit which AgGrow would have received if the plant had performed as specified." (Report, Findings of Fact ¶ 29.) The Court therefore adopts the Masters' decision to award lost profits.

### 2. *Betterments*

■ National and Ibberson argue that the Masters' damage determination with

in this case pursuant to section 6.3 for the "delayed performance or non-performance of the Contractor."

regard to repair costs "provides AgGrow with a more expensive and well-appointed facility than it contracted to receive." (Reply & Answer Brief of Ibberson/Anderson at 6, doc. # 178.) Under North Dakota law, "no person can recover a greater amount in damages for the breach of an obligation than the person could have gained by the full performance thereof on both sides." N.D. Cent.Code. § 32–03–36. The Masters correctly applied this legal standard when they made the factual conclusion that the "costs prepared by CHS (as adjusted) constitute an objective and reasonable statement of costs to remedy the deficiencies in the plant and attain completed performance at the guaranteed levels." (Report, Findings of Fact ¶ 27.) The Court rejects the Ibberson/National argument that the Masters' determination of repair costs includes betterments, and it accepts the Masters' determination of damages.

### III. Conclusion

 In sum, the Court accepts the Masters' Report in its entirety, with these three exceptions: the Court does not find that Ibberson is entitled to indemnity pursuant to a contract between them, but the Court finds as a matter of law that Anderson is directly liable to AgGrow, and the Court finds as a matter of law that National is liable for lost revenue in addition to costs of corrective work. Accordingly, National and Ibberson are jointly and severally liable to AgGrow for costs of corrective work and lost revenue and profits in the amount of $2,578,840.53. Of this amount, Anderson is jointly and severally liable with National and Ibberson to AgGrow, for $900,794.20. AgGrow is therefore directed to file a proposed judgment within 10 days of the date of this Order; Ibberson, National, and Anderson will have five days to object to the form of the judgment, though not to its propriety, which has been resolved by this Order.

IT IS SO ORDERED.