2000 ND 62

**Gail WACHTER, aka Gail F. Wachter, Lance A. Wachter, and Wachter Development L.L.C., Plaintiffs and Appellants,**

v.

**GRATECH COMPANY, LTD., Defendant and Appellee**

**No. 990171.**

Supreme Court of North Dakota.

March 24, 2000.

William C. Severin, Severin, Ringsak & Morrow, Bismarck, N.D., for plaintiffs and appellants.

Richard P. Olson (argued) and Troy J. Eickhoff (appearance), Olson Burns Lee, Minot, N.D., for defendant and appellee.

MARING, Justice.

[¶ 1] Gail Wachter, Lance A. Wachter, and Wachter Development, L.L.C. ("Wachter"), appealed from a judgment dismissing with prejudice an action against Gratech Company, Ltd. ("Gratech") for slander of title, abuse of process and lost profits, and awarding Gratech $118,370 plus interest on its counterclaim against Wachter for breach of contract. We conclude the trial court's findings that Wachter breached the parties' contract, Gratech suffered $118,370 in damages as a result of the breach, and Gratech did not commit an abuse of process, are not clearly erroneous. We affirm.

I

[¶ 2] On February 22, 1996, Wachter hired Gratech to excavate about 300,000 cubic yards of dirt for a housing develop-

ment. The terms of the parties' contract were set forth in a letter from Gratech to Wachter:

This is to confirm the work to be accomplished and the price and payment terms for the referenced project.

Grading items per your X–X–96 drawing, which consists of the removal of clay embankment material from a "borrow" area and the placement of this material in a nearby "fill" area. The approximate quantity of excavated material is 300,000 cubic yards and the approximate average haul distance is 3,000 feet.

Price per cubic yard of excavation:

- First 150,000 cy— $.85
- Second 150,000 cy— $.79

Our price includes:

- All labor, equipment and material necessary to provide cut and fill grades as specified.
- Clearing, grubbing and stockpiling the trees in the fill area for removal by others.
- Compaction of embankment in the area of streets as specified by Engineer.

Our price does not include:

- Building permits (if required)
- Utility relocation costs (if any)
- Compaction tests
- Initial layout of the work and "blue-tops"
- Initial and final cross-sectioning of excavation area

. . . .

We ask that a payment in the amount of $20,000 be made at the start of mobilization, that progress payments be made bi-weekly based on estimated quantities and that final payment be made within 10 days of completion. . . .

We understand your objective is to have this site ready for water and sewer line installation in approximately 8 to 10 weeks. We will commit the necessary resources in that effort, but cannot ac-

cept responsibility for weather related or other unforeseen delays outside our control.

[¶ 3] The excavation was part of Wachter's plan for the development of two subdivisions. Swenson Hagen & Company ("Swenson Hagen"), an engineering firm, designed the housing project and proposed digging a lake and using the fill from the lake to raise the elevation of nearby land so it could be developed. Although the excavation was initially estimated to involve more than 300,000 cubic yards of dirt, Wachter estimated the total for compacted fill to be about 240,000 cubic yards. Gratech was to excavate the proposed lake and move the fill to a development area known as Cottonwood Lake Fifth Addition, which did not include the waterfront property. Wachter planned to develop the waterfront property at a later time.

[¶ 4] Gratech initially believed excavation of the lake would require the removal of eight feet of dirt and the company based its proposal to Wachter on that assumption. Before beginning work on the project, however, Gratech realized it would be required to remove 13 feet of dirt, which would involve excavating from below the water table. Swenson Hagen provided markers called "blue tops," which indicated how much fill was needed to be placed into the development area.

[¶ 5] Gratech began the excavation project in February 1996. Gratech soon encountered water at the 13–foot level, which caused problems creating a smooth bottom for the lake. Gratech employees met with Swenson Hagen's land consultant and Wachter's agent to explain these problems. Rather than creating a flat bottom, Gratech dug a series of holes resembling basements and knocked down the walls between them to deal with the challenge of digging below the water table. Wachter's agent and the land consultant either approved or did not object to Gratech's method of digging the lake bottom. This method resulted in an "egg carton" bottom

with small "islands" in the lake. Gratech employees said Wachter representatives told them they were not concerned about the bottom of the lake being flat, but were primarily concerned that sufficient dirt be removed to bring the fill area to the correct grade or elevation.

[¶ 6] Shortly before Gratech completed the project in September 1996, Gratech employees met with the land consultant and Wachter's agent, who expressed concerns about the uneven bottom of the lake. After a Gratech employee reminded them about their earlier meeting regarding the difficulty in making the bottom of the lake flat, there was no further discussion about the lake bottom. The land consultant and Wachter's agent viewed the fill area and requested that Gratech stockpile 4,000 cubic yards of fill for later use.

[¶ 7] On September 4, 1996, Lance Wachter wrote to Gratech stating he knew Gratech would be finished with the excavation project in a few days.

Therefore, I will have the lake crossed-sectioned [sic] to determine the amount of yards excavated. The only problem we have now is the islands in the lake. Who is going to pay, to straighten out.

[¶ 8] Gratech responded on September 6, 1996, telling Wachter:

During discussion with your representatives, Gratech's project superintendents pointed out that it was not possible to excavate to the "neat line" in these conditions. They were told the primary objective of the project was to obtain material for fill and that the final condition of the borrow area bottom was not a significant concern.

Our position on this matter is that we have done the best we can to deal with a condition that was not apparent at the time the agreement was made. Any further work on the borrow area must be for the account of others.

In any event, though, we believe that over time the lake bottom will level out on its own. We do not feel any of the parties involved should spend money in this effort.

Wachter did not respond to Gratech's letter.

[¶ 9] On January 20, 1997, Gratech sent Wachter a final invoice for $66,761. The invoice was based on information about the amount of dirt excavated provided by the Swenson Hagen land consultant. Gratech later learned the land consultant had not had the property cross-sectioned as called for by the contract, but had used a different method of calculating the amount of dirt excavated. Cross-sectioning is a process where measurements are taken of the topography of land to determine how much dirt has been removed or added. Generally, information concerning the topography before changes are made and after changes are made is necessary to gain an accurate measurement. The land consultant said the lake could not be accurately cross-sectioned because of the pitted nature of the bottom of the lake. However, cross-sectioning also was not performed before Gratech began the excavation project, and Gratech was not told before sending the final invoice of the failure to cross-section the lake.

[¶ 10] On December 12, 1997, almost 11 months after the final invoice had been sent and no payment had been made, Gratech again wrote to Wachter claiming Wachter had not acted in accordance with the contract, had changed the scope of the work, had failed to perform cross-sectioning and had failed to make payments. Gratech informed Wachter that, because of these reasons, Wachter would be billed on an "equipment time" hourly basis and requested payment of $571,297.65. Wachter did not respond to the letter or pay the invoice.

[¶ 11] On May 20, 1998, Wachter was served by certified mail with a notice of intention to claim a mechanic's lien. However, Wachter refused the certified mail, and on June 9, 1998, Gratech filed a mechanic's lien in the amount of $571,297.65.

[¶ 12] On June 12, 1998, Wachter brought this lawsuit against Gratech, seeking damages for slander of title, abuse of process and lost profits. Gratech counterclaimed for breach of contract and sought release of land sale proceeds from the development, which had been deposited in escrow by agreement of the parties, payment of $691,126.81 in principal and interest on the mechanic's lien, and a declaration that its lien be given first priority on the development property. On October 5, 1998, the trial court ruled the mechanic's lien could be enforced only in the amount of $102,570.90, with interest at the legal rate, but further ruled Gratech "may prove damages in excess of that amount when the issues between the parties are tried."

[¶ 13] Following a bench trial, the trial court found Gratech's filing of the mechanic's lien was not an abuse of process or slander of title, and Wachter "failed to establish a claim for lost profits." The court found Gratech was "justified" in filing its mechanic's lien because Wachter "failed to pay the amounts claimed due by Gratech, failed to communicate with Gratech regarding the disputed claim, and provided misleading information regarding the amount of fill excavated." Although Gratech filed the mechanic's lien in an amount higher than appropriate, the court reasoned this was "the result of Wachter's own failure to respond reasonably."

[¶ 14] On the counterclaim, the trial court ruled Wachter materially breached the contract "by failing to have cross-sectioning done to determine the amount of dirt moved and by failing to make payments." Although Wachter estimated 217,266.15 cubic yards of dirt were excavated based on cross-sectioning performed after commencement of the lawsuit, the trial court found this figure was inaccurate and chose the following as the most reasonable method of calculating the amount which should have been paid to Gratech:

It is reasonable to allow Gratech to recover for removal of 320,000 cubic yards, which was within the amount con- templated to be moved when the parties negotiated their agreement. This amount is supported by evidence presented concerning records kept by workers who performed the excavation. They estimated 323,227 cubic yards of dirt were moved. More accurate information may have been provided through cross-sectioning, but [Wachter] failed to have cross-sectioning done. Without initial cross-sectioning, any calculations of the amount of dirt removed are speculative and Gratech is entitled to rely on the best information it had—that compiled by its workers.

[¶ 15] Judgment was entered in favor of Gratech for $118,370 plus interest, and Wachter appealed.

## II

[¶ 16] Wachter contends the trial court erred in finding Wachter breached the contract with Gratech and in calculating the amount of damages owed to Gratech.

■■■ [¶ 17] Whether a contract has been substantially performed and whether a party has breached a contract are findings of fact which will not be reversed on appeal unless they are clearly erroneous. See All Seasons Water Users v. Northern Improvement Co., 399 N.W.2d 278, 280 (N.D.1987); Mitchell v. Preusse, 358 N.W.2d 511, 513 (N.D.1984). A trial court's determination of the amount of damages caused by a breach of contract is also a finding of fact subject to review under N.D.R.Civ.P. 52(a). See Korol v. Aronson, 360 N.W.2d 684, 686 (N.D.1985). A finding of fact is clearly erroneous if it is not supported by any evidence, if, although there is some evidence to support the finding, a reviewing court is left with a definite and firm conviction a mistake has been made, or if the finding is induced by an erroneous conception of the law. CAP Partners v. Cameron, 1999 ND 178, ¶ 11, 599 N.W.2d 309. We do not reexamine findings of fact made by the trial court upon conflicting evidence. Robert v. Air-

*craft Inv. Co., Inc.,* 1998 ND 62, ¶ 10, 575 N.W.2d 672. We give due regard to the trial court's opportunity to assess the credibility of the witnesses, and the court's choice between two permissible views of the weight of the evidence is not clearly erroneous. *Wachter Development, L.L.C. v. Gomke,* 1998 ND 119, ¶ 9, 579 N.W.2d 209.

## A

[¶ 18] Wachter argues the trial court's finding Wachter breached the contract by failing to have the lake cross-sectioned and by failing to make payments is clearly erroneous because Gratech had a duty to excavate in a manner that allowed the lake to be cross-sectioned, and this duty was a condition precedent to Wachter's duty to cross-section and determine excavated volume.

[¶ 19] A condition precedent is a condition which is to be performed before some right dependent thereon accrues or some act dependent thereon is performed. N.D.C.C. § 9–01–11. Before a party can enforce conditional contract obligations, the party must perform those requisite conditions for which the party is responsible. *United Bank of Bismarck v. Trout,* 480 N.W.2d 742, 748 (N.D.1992); *see also* N.D.C.C. § 9–01–16. Whether the doing of an act is a condition precedent depends on the intention of the parties as deduced from the whole instrument. *E.E.E., Inc. v. Hanson,* 318 N.W.2d 101, 105 (N.D. 1982).

[¶ 20] Contrary to Wachter's assertion, the parties' contract clearly placed the responsibility for both the initial and final cross-sectioning of the excavation area upon Wachter. Cross-sectioning was one of several items in Gratech's "our price does not include" list, and Wachter even acknowledged responsibility for cross-sectioning in his September 4, 1996 letter to Gratech. The evidence established that Wachter did not have an initial cross-sectioning performed before excavation began, and did not have a final cross-sectioning performed until after this lawsuit was commenced.

[¶ 21] Notwithstanding Wachter's initial failure to have the lake area cross-sectioned before excavation work began, Wachter claims the obligation to perform the final cross-sectioning was rendered impossible and was prevented by Gratech's failure to excavate the lake so it had a smooth bottom, and a smooth lake bottom was a condition precedent to both the final cross-sectioning and payment. *See* N.D.C.C. § 9–11–04(1); *Tallackson Potato Co., Inc. v. MTK Potato Co.,* 278 N.W.2d 417, 424 n. 6 (N.D.1979); *Fargo Public Library v. City of Fargo Urb. Renew. Ag.,* 185 N.W.2d 500, 505 (N.D.1971). Although Wachter presented evidence that, because of the lake bottom configuration, it would have been impossible, highly inaccurate and extremely expensive to attempt to cross-section at the time the project was completed, Gratech presented testimony that final cross-sectioning was possible, albeit its accuracy would be questionable. Given Wachter's failure to have the lake area cross-sectioned before work began, which was itself a breach of the contract rendering improbable achievement of an accurate estimate of excavated dirt after the final cross-sectioning, it is difficult to comprehend how Gratech's alleged breach of the condition precedent had a substantial affect on the accuracy of any volume figures derived from a final cross-sectioning.

[¶ 22] Moreover, conditions precedent may be waived, either expressly or by implication resulting from acts or conduct, by the party in whose favor they are made. *See Fargo Public Library,* 185 N.W.2d at 504. Although Gratech did not plead waiver as an affirmative defense under N.D.R.Civ.P. 8(c), where, as here, the trial court receives evidence on an unpleaded affirmative defense and considers that evidence in arriving at its decision, we consider the merits of the affirmative defense under the theory the issue was tried

by the implied consent of the parties. *See Freed v. Unruh,* 1998 ND 34, ¶ 8, 575 N.W.2d 433. Even if a smooth lake bottom was a condition precedent to a final cross-sectioning, the evidence supports the trial court's finding that "Wachter's project engineers and agent were aware of [Gratech's] method of digging the lake and either approved or did not object." Thus, Wachter waived any right to rely on a smooth lake bottom as a condition precedent to its obligations to perform final cross-sectioning and to make payment.

[¶ 23] Wachter also argues Gratech breached the contract by failing to dig the lake 13 feet deep and by failing to dig its full perimeter. According to Wachter, because of Gratech's breach, Wachter has suffered damages because there are fewer waterfront lots to develop and their price had to be discounted because of lack of fill.

[¶ 24] There is evidence indicating that any deviations from the specifications called for in the contract were not the fault of Gratech, but were caused by the project engineers, Swenson Hagen. Swenson Hagen's land consultant, who planned the project and prepared the final draft of a map showing where the lake should be, had his surveyors go to the site and stake the perimeter of the lake and the center line of the proposed streets in the fill area "so it was obvious for the excavator to come and look at. . . ." Although the land consultant testified his crew of workers who monitored the excavation was unable to measure the bottom of the lake, he said "we kept the stakes up around the outside edge of the hole" and "[w]e could see that the side slopes ... were always accurate and neat." Gratech's project superintendent testified he did not move any of Swenson· Hagen's stake boundaries and Wachter representatives did not complain about any problems with the site. When work was completed, Gratech's superintendent notified Wachter representatives who confirmed Gratech had filled to the staked elevation on the center line of the streets. They only requested that Gratech stock-pile 4,000 cubic yards of dirt for future use.

[¶ 25] There is substantial evidence that Gratech did not breach the contract, but merely followed the instructions given by Wachter's project engineers. We conclude the trial court's finding that Wachter materially breached the contract by failing to perform cross-sectioning and by failing to make payments is not clearly erroneous.

**B**

[¶ 26] Wachter contends the trial court erred in calculating the damages owed to Gratech.

[¶ 27] In *Leingang v. City of Mandan Weed Bd.,* 468 N.W.2d 397, 398 (N.D.1991), this Court explained:

For a breach of contract, the injured party is entitled to compensation for the loss suffered, but can recover no more than would have been gained by full performance. NDCC §§ 32–03–09, 32–03–36. Our law thus incorporates the notion that contract damages should give the non-breaching party the benefit of the bargain by awarding a sum of money that will put that person in as good a position as if the contract had been performed. *See generally* 22 Am. Jur.2d *Damages* § 45 (1988).

[¶ 28] Wachter estimated the project would involve the removal of "approximate[ly]" 300,000 cubic yards of clay from the borrow area in order to provide 240,-000 cubic yards of compacted material in the fill area. Wachter also provided plans to Gratech which illustrated 320,000 cubic yards of clay were available for this purpose. Gratech relied on those representations in making its bid for the project. Swenson Hagen's land consultant testified these preliminary plans which were given to Gratech were inaccurate, but he did not inform Gratech.

[¶ 29] In assessing damages, the trial court relied on calculations made from the Gratech site superintendent's running load

count kept in daily log books which were used to record work progress at the site. The number of truck loads per day hauled from the borrow area to the fill area was multiplied by an estimate of how many cubic yards the trucks held per load. This method resulted in a total of 323,227 cubic yards estimated by the load count, which is close to the 320,000 cubic yards originally anticipated by Wachter. The trial court reduced the load count estimate to 320,000 cubic yards, and after applying the parties' contractual formula, found Wachter still owed Gratech $118,370 for the excavation work.

[¶ 30] Wachter argues the trial court should have accepted the results of a final cross-sectioning performed in 1998 showing a volume of only 217,000 cubic yards of clay had been removed. However, the evidence establishes that any cross-sectioning performed without an initial cross-sectioning, which Wachter did not perform in this case, would result in inaccurate calculations. Wachter alternatively argues the court should have accepted the land consultant's calculated estimate of 254,000 cubic yards because Gratech "accepted" and based its final invoice for $66,761 on that measurement. However, Gratech was under the mistaken belief that the 254,000 cubic yard total was based on cross-sectioning when it billed Wachter for that amount. Wachter also argues the trial court should not have used Gratech's load count because this method was not contemplated by the parties. However, the accuracy of the parties' contemplated method of measurement, cross-sectioning, was placed in jeopardy by Wachter's own failure to have an initial cross-section performed on the site before any excavation work began.

[¶ 31] The trial court was presented with conflicting evidence on the damage issue. The trial court chose Gratech's estimated load count as the most reasonable method to calculate damages, and the damage award is within the realm of the evidence presented. Under the circumstances, we are not left with a definite and firm conviction that the trial court's $118,370 damage award is clearly erroneous.

III

[¶ 32] Wachter does not challenge the trial court's dismissal of the slander of title and lost profits claims, but argues the court erred in finding Gratech did not commit an abuse of process by filing an inflated mechanic's lien.

[¶ 33] This Court discussed abuse of process in *Stoner v. Nash Finch, Inc.*, 446 N.W.2d 747, 751 (N.D.1989):

The tort of abuse of process is described in Restatement (Second) of the Law of Torts § 682 (1976): "One who uses a legal process, whether criminal or civil, against another primarily to accomplish a purpose for which it is not designed, is subject to liability to the other for harm caused by the abuse of process." The essential elements of the tort are discussed in Prosser and Keeton, *The Law of Torts* § 121, at p. 898 (5th ed.1984):

"The essential elements of abuse of process, as the tort has developed, have been stated to be: first, an ulterior purpose, and second, a wilful act in the use of the process not proper in the regular conduct of the proceeding. Some definite act or threat not authorized by the process, or aimed at an objective not legitimate in the use of the process, is required; and there is no liability where the defendant has done nothing more than carry out the process to its authorized conclusion, even though with bad intentions. The improper purpose usually takes the form of coercion to obtain a collateral advantage, not properly involved in the proceeding itself, such as the surrender of property or the payment of money, by the use of the process as a threat or a club. There is, in other words, a form of extortion, and it is what is done in the course of negotiation, rather than the issuance or any

formal use of the process itself, which constitutes the tort." [Footnotes omitted].

▮▮▮ [¶ 34] Although an abuse of process is recognized even when no property is taken and the attempted extortion is wholly unsuccessful, *Volk v. Wisconsin Mortgage Assur. Co.*, 474 N.W.2d 40, 44 (N.D.1991), the plaintiff still must show actual damages suffered as a result of the abuse of process. *See Blair v. Maxbass Security Bank*, 44 N.D. 12, 14, 19, 176 N.W. 98, 101 (1919); *see also Lauren Corp. v. Century Geophysical Corp.*, 953 P.2d 200, 202 (Colo.App.1998); *Fuller v. Local Union No. 106*, 567 N.W.2d 419, 422 (Iowa 1997); *Tanguay v. Asen*, 722 A.2d 49, 50 (Me.1998); *One Thousand Fleet v. Guerriero*, 346 Md. 29, 694 A.2d 952, 956 (1997); *Gordon v. Community First State Bank*, 255 Neb. 637, 587 N.W.2d 343, 351 (1998); *Bank of Oklahoma, N.A. v. Portis*, 1997 OK CIV APP 32, 942 P.2d 249, 255 (1997); *RRR Farms, Ltd. v. American Horse Protection Ass'n*, 957 S.W.2d 121, 133 (Tex.App.1997). Good faith is a defense. *A & A Metal Bldgs. v. I-S, Inc.*, 274 N.W.2d 183, 187 (N.D.1978).

[¶ 35] The trial court found Gratech's filing of the mechanic's lien for $571,297.65 was not an abuse of process, reasoning in part:

> [Wachter's] persistent failure to communicate with Gratech and the misleading information provided by Wachter concerning the amount of fill excavated led to Gratech's filing of the mechanic's lien. While the Court does not agree with the method used to calculate the amount of that lien, the filing of a mechanic's lien was necessary and Wachter's attention to the correspondence of Gratech could have avoided the filing of the lien in an amount higher than ultimately determined appropriate.

[¶ 36] We are troubled by the trial court's reasoning, which seems to suggest an abuse of process can be "forgiven" if it is "invited" by the plaintiff. We know of no such rule. The gist of the tort of abuse of process is the misuse or misapplication of the legal process to accomplish an end other than that which the process was designed to accomplish, and it is the purpose behind the use of the legal process that is controlling. *Kummer v. City of Fargo*, 516 N.W.2d 294, 297 (N.D.1994).

▮▮▮ [¶ 37] Under the mechanic's lien laws, a lien must be for a contractually agreed price, "otherwise . . . it must be for the reasonable value of the work done, and of the skill and material furnished." N.D.C.C. § 35–27–06. A lien may not "exist for a greater amount than the sum claimed in the lien account, nor for any amount, if it be made to appear that the claimant has knowingly demanded in the statement more than is justly due." N.D.C.C. § 35–27–16. In *Blair*, 44 N.D. at 14, 18, 176 N.W. at 99, 100, this Court dealt with a situation in which the plaintiffs sought to recover damages for abuse of process from a bank which had sued to foreclose mortgages for an amount more than four times what the plaintiffs owed the bank. This Court concluded the complaint, which alleged the plaintiffs suffered damages as a result of the bank's actions, stated a cause of action for abuse of process and reversed and remanded for a new trial. *Blair*, 44 N.D. at 19, 176 N.W. at 101.

[¶ 38] In other jurisdictions, some plaintiffs have been successful in recovering on abuse of process claims based upon the defendants' filing of meritless or grossly inflated mechanic's liens. *See, e.g., Display Fixtures Co. v. R.L. Hatcher, Inc.*, 438 N.E.2d 26, 31 (Ind.App.1982); *Kleinschmidt v. Morrow*, 642 A.2d 161, 164 (Me.1994). Claims of abuse of process based on allegedly inflated mechanic's liens generally have been unsuccessful when there is a legitimate dispute over the amount of money owed to the lien filer. *See, e.g., Montgomery GMC Trucks, Inc. v. Nunn*, 657 S.W.2d 334, 336 (Mo.App. 1983); *Weaver v. Acampora*, 227 A.D.2d 727, 642 N.Y.S.2d 339, 341 (1996); *New*

York State Properties Inc. v. Clark, 183 A.D.2d 1003, 583 N.Y.S.2d 317, 319 (1992); Key Bank of Northern New York v. Lake Placid Co., 103 A.D.2d 19, 479 N.Y.S.2d 862, 867–68 (1984).

[¶ 39] In this case, Gratech's mechanic's lien was filed for an amount almost five times more than the trial court ultimately found Gratech was entitled to be paid. The amount of the mechanic's lien raises a strong inference of improper purpose. However, the trial court did not err in dismissing the abuse of process claim because Wachter presented no evidence to show damage resulted from the abuse of process. Even though this was not the basis for the trial court's dismissal, we will not set aside a correct result merely because the trial court assigned an incorrect reason if the result is the same under the correct law and reasoning. State Bank & Trust of Kenmare v. Brekke, 1999 ND 212, ¶ 8, 602 N.W.2d 681. Although Wachter testified he had to sell lots for a discounted price, those damages related to Gratech's alleged breach of the contract for not having raised the fill area to the proper elevation. Wachter presented evidence of expended attorney fees, but those fees, captioned "Wachter vs. Gratech" and covering the period from June 11, 1998 to March 1, 1999, were incurred for "this lawsuit." While some courts have held reasonable attorney fees and costs incurred in defending a suit from which the abuse of process arose are recoverable items of damage, see Display Fixtures Co., 438 N.E.2d at 32; 72 C.J.S. Process § 114, at p. 705 (1987), they are not recoverable for litigating the abuse of process damage action itself. See First Sec. Bank of Utah v. J.B.J. Feedyards, 653 P.2d 591, 597 (Utah 1982).

[¶ 40] We conclude the trial court's finding that Gratech did not commit an abuse of process is not clearly erroneous.

IV

[¶ 41] We have considered Wachter's other arguments and deem them to be without merit. The judgment is affirmed.

[¶ 42] GERALD W. VANDE WALLE, C.J., WILLIAM A. NEUMANN, CAROL RONNING KAPSNER, JJ., JOEL D. MEDD, D.J., concur.

[¶ 43] JOEL D. MEDD, D. J., sitting in place of SANDSTROM, J., disqualified.