2009 ND 148

**Sarmed A. ABDULLAH, M.D.,
Plaintiff and Appellant**

v.

**STATE of North Dakota, d/b/a University of North Dakota, and Dr. David J. Theige, individually, Defendants and Appellees.**

No. 20080254.

Supreme Court of North Dakota.

July 29, 2009.

Rehearing Denied Aug. 24, 2009.

Paul Henry Myerchin (argued) and Clark Jay Bormann (appeared), Bismarck, N.D., for plaintiff and appellant.

Tag Christian Anderson (argued), Special Assistant Attorney General, Risk Management Division, Bismarck, N.D., and Kirsten Renata Franzen (on brief), Assistant Attorney General, North Dakota Office of Attorney General, Bismarck, N.D., for defendants and appellees.

MARING, Justice.

[¶ 1] Sarmed Abdullah, M.D., appeals from a summary judgment dismissing his action against the State of North Dakota, doing business as the University of North Dakota, and against Dr. David Theige, the director of the residency program at the University's School of Medicine and Health Sciences, stemming from Abdullah's dismissal from the internal medicine residency program at the University's School of Medicine for "incompetence in the area of [p]rofessionalism." Abdullah argues his dismissal from the residency

program was arbitrary and capricious, and he asserts the district court erred in granting summary judgment because there are genuine issues of material fact on each of his claims. We affirm.

I

[¶ 2] Abdullah graduated from the Damascus University School of Medicine in Syria in 1999. In July 2001, he began a residency training program with the Medical College of Wisconsin, which included three rotations. As a result of evaluations in those rotations, the school offered him three options: (1) resign from the residency program; (2) accept probation and a remediation plan; or (3) take a leave of absence from the program and find another residency program. Abdullah decided to take a leave of absence and enrolled in a Post Graduate Year 1 internal medicine residency program at East Tennessee State University from August 2003 through September 2004.

[¶ 3] On October 1, 2004, Abdullah began an internal medicine residency program at the University's School of Medicine for his Post Graduate Year 2. Abdullah's application to the University's residency program listed the Medical College of Wisconsin under "CONTINU-ING MEDICAL EDUCATION (CME) Courses in Internal Medicine," rather than under a "Residency" section. In April 2005, Abdullah executed a "resident contract" with the University for a training program in internal medicine at the Post Graduate Year 3 level, which ran from October 1, 2005, through September 30, 2006. The "residence contract" provided that "appropriate certification [would] be provided upon satisfactory completion of the education and training program," and "[u]nsatisfactory or persistently less than satisfactory resident evaluation can result in required remedial ac-

tivities, temporary suspension from duties, or termination of employment and residency education." The contract also said the "resident [could] be terminated for unsatisfactory or persistently less than satisfactory performance of duties as determined by supervising faculty or for failure to progress in medical knowledge and skills."

[¶ 4] In a June 28, 2006, letter to Abdullah, Theige, the director of the residency program, informed Abdullah that his "recent behavior and correspondence ha[d] made [Theige] very concerned about [Abdullah's] personal well-being and mental health," and Theige informed Abdullah that he had been placed on an "emergency leave of absence from the residency program, pending a psychiatric evaluation." Abdullah subsequently returned to the program on August 1, 2006, but his scheduled completion date for his residency training was extended to October 20, 2006.

[¶ 5] In an October 12, 2006, letter to Abdullah, Theige informed Abdullah that he was temporarily suspended from the residency program, pending a psychiatric examination, for concerns about his "professional behavior." In an October 23, 2006, letter to Abdullah, Theige summarized Abdullah's status with the residency program, including professionalism concerns about Abdullah's failure to disclose his residency at the Medical College of Wisconsin and the circumstances of his departure from that program, Abdullah's conduct regarding authorship of a research manuscript with Dr. William Newman, and Abdullah's conduct regarding a home visit with a patient:

On June 22, 2006, I received an email from you telling me that you did not intend to finish our program "if after July, 2006 my GI Fellowship contract in Mayo Clinic is not on the desk." I sent you a reply indicating my bewilderment,

and asked to meet with you the next day. I later found out that you had just learned of your failure to match with a GI fellowship program. I am also aware that you were just finishing a rotation as the night float resident. The next morning, I came to work and discovered a handwritten note from you on my desk requesting my "testimony about [Abdullah] to the Chief Justice of the United States John Roberts in the U.S. Supreme Court in Washington D.C. for the attached application. Your cooperation-not obstruction-of Justice will be appreciated." The note was attached to a typewritten 2-page "Personal Statement to the Supreme Court of the United States" which I found to be almost incoherent. At that point, I learned that you had left town that morning to begin a vacation. I met with you in my office on June 28, 2006. At that time, you appeared to be calm, coherent, and reasonable, but I placed you on an emergency medical leave from the program pending a psychiatric evaluation.

In addition to the question of your mental health, I was also concerned about part of the content of your "Personal Statement to the Supreme Court." In that document, you mentioned that you had been a resident at the Medical College of Wisconsin in the summer of 2001. I was not previously aware of this. In your curriculum vitae included with your application to our program, you did list your preliminary residency in internal medicine at East Tennessee State University. An experience at the Medical College of Wisconsin was listed only in small print under the heading "Continuing Medical Education (CME) courses in Internal Medicine." We verified, with your cooperation, that you had been a resident at MCW, and that you resigned.

You underwent an extensive psychiatric evaluation at the University of Pittsburgh in July 2006. I received a letter from your psychiatrist on July 18, 2006. The psychiatrist wrote that your psychiatric symptoms were contextual and related to sleep deprivation. He indicated that with treatment of the sleep disturbance, you could return to work after July 21, 2006. Our Resident Evaluation and Advancement Committee reviewed this matter on July 25, 2006. The committee recommended that you should be reinstated to the program after completing a meeting with the program director, but that concerns about your professionalism should be noted and reported in the future when requests for verification of training are received. I met with you on July 27, 2006. You were reinstated to the program as of August 1, 2006. Your anticipated completion date for the program was postponed to October 20, 2006 because of your recent medical leave.

On September 28, 2006, Dr. William Newman sent me a letter expressing his concern about your professional behavior related to your joint research effort. Over the next several days, I received additional correspondence from other faculty and staff expressing concerns about your behavior. One of the concerns was that you initiated a home visit with a patient without appropriate attending physician supervision and that you contacted a physician at the Mayo Clinic on this patient's behalf, but that you did not appropriately identify yourself as a resident physician. Finally, on October 12, 2006, a staff member ... reported that she was very frightened by your behavior and that she felt unsafe. I met with you later that morning and suspended you from the program pending a psychiatric evaluation.

After I receive a report from your psychiatrist, this matter will be referred to the Resident Evaluation and Advancement Committee. One of the serious issues to be considered is the matter of my evaluation of your performance in each core competency, but especially in professionalism. In order to receive credit for the final year of training and successfully complete our program, a third-year resident must be given satisfactory ratings in each competency area. My rating of your performance in professionalism will be determined after appropriate review of the matters outlined above.

[¶ 6] In a November 6, 2006, letter to Abdullah, Theige informed Abdullah that the University's Resident Evaluation and Advancement Committee had reviewed Abdullah's status and recommended dismissing Abdullah from the residency program. In that letter, Theige informed Abdullah of his dismissal from the residency program.

[¶ 7] Abdullah appealed the dismissal to a Resident Fair Process and Grievance Hearing Panel, which resulted in an evidentiary hearing before a panel of five doctors. The Hearing Panel affirmed the decision to dismiss Abdullah from the residency program for "incompetence in the area of [p]rofessionalism," finding:

1) The reference to three months in the Medical College of Wisconsin residency on the CV Dr. Abdullah submitted with his UND ... application appears following a section on Continuing Medical Education credit and not in the section with his East Tennessee State University residency year. He denies this was an attempt to conceal this residency affiliation. On his Application for Residents for the VA, signed 4–26–04, he listed it clearly under previous residencies, however, he checked a "No" response to a question "Within the last five years have you resigned or retired from a position after being notified you would be disciplined or discharged, or after questions about your clinical competence were raised?" The letter from Dr. Olds [at the Medical College of Wisconsin] to Dr. Abdullah ... clearly indicates that he was already on probation and that he was offered resignation as an alternative to accepting continuing probation and remediation.

2) The research manuscript in question describes both phase I and phase II projects. Dr. Newman was identified by all evidence and testimony as the mentor for the phase I, or initial, project, for which he was listed as the principle investigator in the submission to the Institutional Review Board. In testimony, Dr. Abdullah described the addition of the phase II component with Dr. Santoro as mentor. He submitted the manuscript to the *Mayo Clinic Proceedings* without either mentor listed as coauthor, instead providing an acknowledgement for each. Dr. Stephanie Borchardt, research coordinator at the VA, had suggested the acknowledgement for Dr. Newman, as a minimum, after judging it to be unprofessional not to include Dr. Newman as an author. Dr. Newman was not presented a draft or any other copy of the manuscript before its submission and finally obtained an earlier copy, not the version submitted, by petitioning for it under the Freedom of Information Act to Dr. Borchardt. Dr. Abdullah did not present his findings or final write-up at a residency Research Committee meeting as required by the Program's Resident Research Requirement.

3) The visit to a former patient's home was conducted for reasons that are inconsistently explained by [Abdullah], both from his documentation at the time of the event and from his testimony at this hearing. He described it as having occurred both as a medical or community outreach activity and as an effort to obtain consent from the patient to use his records as the basis for a case report. Such a home visit, for any reason, by a resident in the program has never been done and is not a part of the training experience, nor was this visit approved or supervised by anyone in the program. The special license granted to residents by the State of North Dakota does not allow for any professional activities outside the scope of resident duties or supervision. [Abdullah] also moved to take over the care of this patient by scheduling him for an office visit without conferring first with either the patient's current primary care physician or discussing it with a clinic supervisor or administrator. He also failed to properly identify himself as a resident when he contacted a physician at Mayo Clinic seeking information pertaining to this patient.

. . . .

1) The Hearing Panel concluded that Dr. Abdullah deliberately misrepresented his academic and employment history to avoid revealing the circumstances of his having left the Medical College of Wisconsin Internal Medicine Residency under disciplinary proceedings, and that this constitutes a substantial act of unethical and unprofessional conduct. Although the location of the reference to the Medical College of Wisconsin residency on the CV Dr. Abdullah submitted with his UND . . . application, combined with his testimony, leave it unclear whether this was a knowing and deliberate misrepresentation, the response on his VA application to the question regarding resignation under disciplinary conditions or questions of competence provides clear evidence of his intent to hide this fact.

2) The Panel concluded that Dr. Abdullah was unethical and unprofessional in his attempt to bar or remove a principle investigator, Dr. Newman, from work and publication over which the investigator rightfully had jurisdiction, and in deliberately submitting for publication a manuscript in violation of the program's requirements concerning resident research.

3) The Panel concluded that Dr. Abdullah's conduct concerning a home visit to a former patient and conduct concerning the patient involved in that visit was unethical and unprofessional. The visit itself was unprecedented by a resident in this program, unapproved, unsupervised and outside the scope of his resident duties and resident licensure. Seeking a patient's consent for publication by visiting him in his home is a highly irregular and troublesome approach, showing disregard for the ethical implications of the means by which to obtain consent from patients. During and following that visit he attempted to take over care of the patient, inappropriately intervened by trying to gather medical information on a patient for whom someone else had primary clinical responsibility, and failed to identify himself properly to a Mayo Clinic physician.

Abdullah appealed the Hearing Panel's decision to the Dean of the University's School of Medicine, who upheld the Hearing Panel's decision to dismiss him from the residency program.

[¶ 8] Abdullah then sued the University and Theige individually in district court, alleging: (1) the University breached its residency contract with Abdullah; (2) Theige intentionally interfered with Abdullah's prospective business opportunity; (3) the University and Theige arbitrarily, capriciously, and wrongfully dismissed Abdullah from the residency program, which violated his substantive due process rights under 42 U.S.C. § 1983; and (4) the University arbitrarily and capriciously dismissed Abdullah from the residency program in violation of Title I of the Americans with Disabilities Act of 1990, ["ADA"] 42 U.S.C. § 12102 et seq., and the North Dakota Human Rights Act, N.D.C.C. ch. 14–02.4. Abdullah sought damages and certification of successful completion of his third year of the residency program. The district court granted summary judgment for the University and Theige.

II

[¶ 9] The district court decided this case in the posture of summary judgment, which is a procedure for promptly resolving a controversy on the merits without a trial if either party is entitled to judgment as a matter of law, and if no dispute exists as to either the material facts or the inferences to be drawn from undisputed facts, or if resolving disputed facts would not alter the result. *ACUITY v. Burd & Smith Constr., Inc.*, 2006 ND 187, ¶ 6, 721 N.W.2d 33. A district court's decision on a motion for summary judgment is a question of law that we review de novo on the record. *Riemers v. Grand Forks Herald*, 2004 ND 192, ¶ 4, 688 N.W.2d 167. The party moving for summary judgment must show there are no genuine issues of material fact and the case is appropriate for judgment as a matter of law. *Green v. Mid Dakota Clinic*, 2004 ND 12, ¶ 5, 673 N.W.2d 257. A party

resisting a motion for summary judgment cannot merely rely on the pleadings or other unsupported conclusory allegations, but must present competent admissible evidence by affidavit or other comparable means which raises an issue of material fact. *Beckler v. Bismarck Pub. Sch. Dist.*, 2006 ND 58, ¶ 7, 711 N.W.2d 172. "In summary judgment proceedings, neither the trial court nor the appellate court has any obligation, duty, or responsibility to search the record for evidence opposing the motion for summary judgment." *Fish v. Dockter*, 2003 ND 185, ¶ 15, 671 N.W.2d 819 (quoting *Anderson v. Meyer Broadcasting Co.*, 2001 ND 125, ¶ 14, 630 N.W.2d 46). "The opposing party must also explain the connection between the factual assertions and the legal theories in the case, and cannot leave to the court the chore of divining what facts are relevant or why facts are relevant, let alone material, to the claim for relief." *Fish*, at ¶ 15 (quoting *Anderson*, at ¶ 14).

III

[¶ 10] Abdullah argues his dismissal from the residency program was arbitrary and capricious and the district court erred in granting summary judgment because there are genuine issues of material fact on each of his claims. He argues the professionalism issue was a pretext for mental health problems and his dismissal was arbitrary and capricious. He claims he did not misrepresent his reasons for leaving the Medical College of Wisconsin, he did not violate the University's standards for authorship for a research article, and he did not provide medical services to a patient in a home visit.

A

[¶ 11] Abdullah argues there are disputed issues of material fact about whether the University breached its con-

tractual obligation to certify his graduation from the residency program. He claims he was dismissed for a disciplinary matter and not for academic reasons and, even if his dismissal was for academic reasons, the University did not act in good faith and its reasons for dismissal were arbitrary and capricious.

[¶ 12] In rejecting Abdullah's breach of contract claim, the district court said there was no provision in the residency contract that required the University to graduate a resident and the contract gave the University vast discretion for academic decisions. The court said a reasonable person could find Abdullah engaged in unprofessional conduct during the residency program, which meant he failed to satisfactorily perform in the core competency area of professionalism.

[¶ 13] Our analysis of Abdullah's breach of contract claim requires consideration of the scope of judicial analysis of the decision to dismiss Abdullah from the residency program. We have said the prima facie elements of a breach of contract action are the existence of a contract, a breach of the contract, and damages flowing from the breach of contract. *Van Sickle v. Hallmark & Associates,* 2008 ND 12, ¶ 11, 744 N.W.2d 532. A breach of contract occurs when there is nonperformance of a contractual duty. *Id.* Whether a contract has been substantially performed and whether a party has breached a contract generally are questions of fact. *Wachter v. Gratech Co. Ltd.,* 2000 ND 62, ¶ 17, 608 N.W.2d 279.

[¶ 14] In *Thompson v. Associated Potato Growers, Inc.,* 2000 ND 95, ¶ 20, 610 N.W.2d 53 (quoting *Cotran v. Rollins Hudig Hall Int'l, Inc.,* 17 Cal.4th 93, 69 Cal. Rptr.2d 900, 948 P.2d 412, 422 (1998)), we held a private employer's decision to terminate an employee for cause was subject to judicial analysis under an objective good-faith standard, in which:

> an employer is justified in terminating an employee for good cause for "fair and honest reasons, regulated by good faith on the part of the employer, that are not trivial, arbitrary or capricious, unrelated to business needs or goals, or pretextual. A reasoned conclusion, in short, supported by substantial evidence gathered through an adequate investigation that includes notice of the claimed misconduct and a chance for the employee to respond."

[¶ 15] In *Peterson v. North Dakota Univ. Sys.,* 2004 ND 82, ¶¶ 11–18, 678 N.W.2d 163, we considered the standard for judicial analysis of a tenured university instructor's breach of contract action against the State. We concluded that in a breach of contract action involving the Board of Higher Education's dismissal of a contract employee, judicial analysis of the substantive decision to terminate the employee was limited to deciding whether a reasoning mind could have reached the same conclusion on the evidence presented. *Id.* at ¶ 18. *See also Ellis v. North Dakota State Univ.,* 2009 ND 59, ¶ 42, 764 N.W.2d 192 (applying *Peterson* to termination action brought under Human Right's Act). In *Peterson,* at ¶ 24, we affirmed a summary judgment dismissal of the tenured university instructor's breach of contract action:

> Viewing the facts and reasonable inferences in a light most favorable to Peterson, we conclude she has not raised a genuine or material issue of fact showing a reasoning mind could not have concluded there was adequate cause to dismiss her. Rather, the record reflects that different committees, boards, or persons placed different weight on the evidence presented. Peterson contracted for the procedures afforded to her.

A breach of Peterson's employment contract does not occur merely because she disagrees with the substantive result of those procedures. The mere fact that different opinions could be reached based on the facts is not sufficient to establish the Board breached her employment contract. There was sufficient evidence in the record for a reasoning mind to conclude clear and convincing evidence existed to dismiss Peterson for cause. Accordingly, we affirm the summary judgment dismissing Peterson's breach of contract claim.

■ [¶ 16] A common thread in *Thompson* and *Peterson* is that, in a breach of contract action, we afford a high degree of deference to an employer's decision to terminate an employee's employment for cause. Here, Abdullah was dismissed from the residency training program at a public educational institution for proffered reasons involving professionalism and academic performance. "Courts are particularly ill-equipped to evaluate academic performance." *Board of Curators of Univ. of Missouri v. Horowitz,* 435 U.S. 78, 92, 98 S.Ct. 948, 55 L.Ed.2d 124 (1978). "Academic evaluations of a student, in contrast to disciplinary determinations, bear little resemblance to the judicial and administrative factfinding proceedings ... which ... traditionally attached a full-hearing requirement." *Id.* at 89, 98 S.Ct. 948. "[T]he determination whether to dismiss a student for academic reasons requires an expert evaluation of cumulative information and is not readily adapted to the procedural tools of judicial or administrative decisionmaking." *Id.* at 90, 98 S.Ct. 948.

[¶ 17] In *Regents of University of Michigan v. Ewing,* 474 U.S. 214, 225–27, 106 S.Ct. 507, 88 L.Ed.2d 523 (1985) (citations and footnotes omitted), the United States Supreme Court discussed a court's

"narrow avenue for judicial review" of an academic decision to dismiss a student from a medical school program in the context of a substantive due process claim:

> When judges are asked to review the substance of a genuinely academic decision, such as this one, they should show great respect for the faculty's professional judgment. Plainly, they may not override it unless it is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment.

> . . . .

> Considerations of profound importance counsel restrained judicial review of the substance of academic decisions. As JUSTICE WHITE has explained:

>> "Although the Court regularly proceeds on the assumption that the Due Process Clause has more than a procedural dimension, we must always bear in mind that the substantive content of the Clause is suggested neither by its language nor by preconstitutional history; that content is nothing more than the accumulated product of judicial interpretation of the Fifth and Fourteenth Amendments. This is ... only to underline Mr. Justice Black's constant reminder to his colleagues that the Court has no license to invalidate legislation which it thinks merely arbitrary or unreasonable."

> Added to our concern for lack of standards is a reluctance to trench on the prerogatives of state and local educational institutions and our responsibility to safeguard their academic freedom, "a special concern of the First Amendment." If a "federal court is not the appropriate forum in which to review the multitude of personnel decisions that are made daily by public agencies," far less is it suited to evaluate the substance

of the multitude of academic decisions that are made daily by faculty members of public educational institutions-decisions that require "an expert evaluation of cumulative information and [are] not readily adapted to the procedural tools of judicial or administrative decision-making."

[¶ 18] Other courts have held that an academic decision to dismiss a resident from a residency program is entitled to deference. *See Bell v. Ohio State University*, 351 F.3d 240, 249–52 (6th Cir.2003) (stating no basis for finding medical student's interest in continuing medical education was protected by substantive due process and court's review of academic decision must show great respect for faculty's professional judgment); *Gupta v. New Britain Gen. Hosp.*, 239 Conn. 574, 687 A.2d 111, 117–22 (1996) (residency agreement between physician and hospital created educational, rather than employment, relationship and decision to dismiss resident from program for poor clinical performance was academic decision entitled to deference).

[¶ 19] We conclude the deferential standard from *Peterson* is applicable to the decision to dismiss Abdullah from the residency program. The decision to dismiss Abdullah was made after he was afforded procedural safeguards, and the record of the proceedings before the Resident Fair Process and Grievance Hearing Panel includes evidence that the substantive decision to dismiss him from the residency program was not a substantial departure from accepted academic norms. Although Abdullah claims the dismissal was arbitrary and capricious and not in good faith, there is sufficient evidence in the record for a reasoning mind to conclude Abdullah was dismissed for incompetence in the area of professionalism. A determination of qualifications and educational experi-ence to practice medicine involves expert evaluation of cumulative information. *See Horowitz*, 435 U.S. at 90, 98 S.Ct. 948. *See also Singha v. North Dakota State Bd. of Med. Exam'rs*, 1998 ND 42, ¶ 32, 574 N.W.2d 838. The district court applied deference to the substantive decision to dismiss Abdullah, concluding the dismissal was an academic decision based on professionalism, and decided a reasonable person could find Abdullah engaged in unprofessional conduct during the residency program. *See Peterson*, 2004 ND 82, ¶ 24, 678 N.W.2d 163. Although Abdullah claims he was dismissed from the residency program for disciplinary reasons and not academic reasons, in the context of the deference accorded the educational institution's decision and the evidence presented at the proceedings before the Hearing Panel, we conclude the district court did not err in granting summary judgment on Abdullah's breach of contract claim.

### B

[¶ 20] Abdullah claims he had a prospective employment contract with another hospital after graduation, and the district court erred in granting Theige summary judgment in his individual capacity on Abdullah's claim for intentional interference with a business opportunity. Abdullah argues Theige acted recklessly and willfully, which coupled with the slanderous per se nature of Theige's allegations, precludes summary judgment.

[¶ 21] In rejecting Abdullah's claim for tortious interference with a business relationship, the district court decided Abdullah failed to establish a predicate independent tort of slander necessary for that claim.

[¶ 22] In *Trade 'N Post, L.L.C. v. World Duty Free Americas, Inc.*, 2001 ND 116, ¶ 35, 628 N.W.2d 707, we recognized a common law action for unlawful interfer-

ence with a business relationship. We held a plaintiff must prove the following elements to prevail in a claim for unlawful interference with a business relationship:

(1) the existence of a valid business relationship or expectancy; (2) knowledge by the interferer of the relationship or expectancy; (3) an independently tortious or otherwise unlawful act of interference by the interferer; (4) proof that the interference caused the harm sustained; and (5) actual damages to the party whose relationship or expectancy was disrupted.

*Id.* at ¶ 36.

[¶ 23] Although Abdullah's complaint does not specifically identify an independent tort to support his claim for unlawful interference with a business opportunity, he asserts statements by Theige were slanderous per se. However, he has not specified which statements by Theige were slanderous per se. Abdullah's amended complaint alleges "Theige acted recklessly or grossly negligently, with malfeasance, willfully and wantonly" in interfering with Abdullah's employment opportunity with another hospital after his scheduled graduation and Theige's actions included "a wrongful suspension from the program only eight (8) days prior to completion, issuance of an informal dismissal from the program in a letter dated November 6, 2006, asserted [Abdullah] failed to disclose authorship, which was erroneous, and failure to disclose in a timely fashion the evidence relied upon for the administrative hearing." In the district court, Abdullah argued Theige told the Hearing Panel that Abdullah was dishonest. However, Abdullah has not marshaled any other specific facts or legal authority to support the existence of an independent tort.

[¶ 24] Under N.D.C.C. § 32–12.2–02(3)(b) and (d), a state employee may not be held liable for claims based upon a discretionary function, regardless of whether the discretion is abused, and a state employee may not be held liable for a decision resulting from a quasi-judicial act. A state employee may not be held liable in the employee's individual capacity for acts occurring within the scope of the employee's employment. N.D.C.C. § 32–12.2–03(3). *See Nelson v. Gillette,* 1997 ND 205, ¶¶ 13–20, 571 N.W.2d 332 (discussing scope of employment in context of action against political subdivision and social worker). Here, Abdullah does not dispute that Theige was acting within the scope of his employment as the director of the residency program at the UND School of Medicine, and we conclude Theige is immune from liability in his individual capacity under N.D.C.C. §§ 32–12.2–02(3)(b) and (d) and 32–12.2–03(3). *See Lawrence v. Roberdeau,* 2003 ND 124, ¶¶ 13–14, 665 N.W.2d 719 (testimony at judicial hearing governed by witness immunity). We conclude the district court did not err in granting summary judgment on Abdullah's claim for interference with a business opportunity.

C

[¶ 25] Abdullah argues the district court erred in granting summary judgment on his substantive due process claim under 42 U.S.C. § 1983. He asserts there are genuine issues of material fact about whether the actions by the University and Theige were unreasonable or arbitrary. The University and Theige argue Abdullah failed to demonstrate a violation of a clearly established law, because the right to attend a public school is not a fundamental right for purposes of substantive due process.

[¶ 26] In rejecting Abdullah's substantive due process claim, the district court said Abdullah had no substantive right to continued education. The court explained

that even if Abdullah had a substantive due process right to continuing education in the residency program, he failed to establish he was arbitrarily and capriciously dismissed from the program and a reasonable person could conclude he was properly dismissed from the program because of professionalism concerns.

[¶ 27] In *Washington v. Glucksberg,* 521 U.S. 702, 719–21, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997) (citations omitted), the United States Supreme Court explained parameters for the analysis of a substantive due process claim in the context of rejecting a substantive due process right to assisted suicide:

The Due Process Clause guarantees more than fair process, and the "liberty" it protects includes more than the absence of physical restraint. The Clause also provides heightened protection against government interference with certain fundamental rights and liberty interests. In a long line of cases, we have held that, in addition to the specific freedoms protected by the Bill of Rights, the "liberty" specially protected by the Due Process Clause includes the rights to marry, to have children, to direct the education and upbringing of one's children, to marital privacy, to use contraception, to bodily integrity, and to abortion. We have also assumed, and strongly suggested, that the Due Process Clause protects the traditional right to refuse unwanted lifesaving medical treatment.

But we "ha[ve] always been reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended." By extending constitutional protection to an asserted right or liberty interest, we, to a great extent, place the matter outside the arena of public debate and legislative action. We must therefore "exercise the utmost care whenever we are asked to break new ground in this field," lest the liberty protected by the Due Process Clause be subtly transformed into the policy preferences of the Members of this Court.

Our established method of substantive-due-process analysis has two primary features: First, we have regularly observed that the Due Process Clause specially protects those fundamental rights and liberties which are, objectively, "deeply rooted in this Nation's history and tradition," and "implicit in the concept of ordered liberty," such that "neither liberty nor justice would exist if they were sacrificed." Second, we have required in substantive-due-process cases a "careful description" of the asserted fundamental liberty interest. Our Nation's history, legal traditions, and practices thus provide the crucial "guideposts for responsible decisionmaking," that direct and restrain our exposition of the Due Process Clause. As we stated recently ... the Fourteenth Amendment "forbids the government to infringe ... 'fundamental' liberty interests *at all,* no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest."

[¶ 28] In two cases, the United States Supreme Court has assumed the existence of a substantive due process right in the context of academic dismissals from a state educational institution, but the Court has held that even if students' assumed property interest gave rise to a substantive due process right, the dismissals were not arbitrary and capricious. *See Ewing,* 474 U.S. at 222–23, 106 S.Ct. 507; *Horowitz,* 435 U.S. at 91–92, 98 S.Ct. 948. In *Bell,* however, the Sixth Circuit Court of Appeals rejected a claim that substantive due pro-

cess protects a medical student's interest in continuing education. 351 F.3d at 251. After stating that the interests protected by substantive due process are much narrower than those protected by procedural due process, the court explained:

> Where ... there is no equal protection violation, we can see no basis for finding that a medical student's interest in continuing her medical school education is protected by substantive due process (stressing, in the public university context, the similarity of equal protection and substantive due process). Certainly the contention that the medical college's actions were arbitrary or capricious cannot be sufficient; otherwise judicial review for compliance with substantive due process would become the equivalent of a typical state or federal Administrative Procedure Act.

351 F.3d at 251 (footnote and citations omitted).

[¶ 29] We agree with the rationale of Bell and conclude Abdullah has not demonstrated that he has a substantive due process right to graduate from a public medical school. *See C.B. v. Driscoll*, 82 F.3d 383, 387–88 (11th Cir.Ct.App.1996) (student's suspension for fighting did not violate substantive due process; right to attend public schools is a state created right rather than a fundamental right for purposes of substantive due process). We conclude the district court did not err in granting summary judgment on Abdullah's substantive due process claim.

## D

[¶ 30] Abdullah argues the district court erred in granting summary judgment on his claim for a violation of the ADA. The University and Theige respond that sovereign immunity bars Abdullah's claim for money damages under Title I of the ADA and that Abdullah failed to address the legal elements for a disability claim.

[¶ 31] In rejecting Abdullah's claim for violation of the ADA, the district court said Abdullah had failed to present any facts to show that the University regarded his bouts with sleep deprivation as a disability and that the University dismissed Abdullah from the residency program because of that perceived disability. Rather, the district court concluded the evidence was clear the University dismissed Abdullah for professionalism concerns, which the court said a reasoning mind could find reasonable.

[¶ 32] In the district court and this Court, Abdullah essentially concedes *Board of Trustees of Univ. of Alabama v. Garrett*, 531 U.S. 356, 121 S.Ct. 955, 148 L.Ed.2d 866 (2001), supports the University's position, but, without citing any other authority to support his ADA claim, Abdullah asserts he could amend his complaint to correct the "technicality." Abdullah has not moved to amend his complaint. Moreover, "[i]n summary judgment proceedings, neither the trial court nor the appellate court has any obligation, duty, or responsibility to search the record for evidence opposing the motion for summary judgment." Fish, 2003 ND 185, ¶ 15, 671 N.W.2d 819 (quoting *Anderson*, 2001 ND 125, ¶ 14, 630 N.W.2d 46). "The opposing party must also explain the connection between the factual assertions and the legal theories in the case, and cannot leave to the court the chore of divining what facts are relevant or why facts are relevant, let alone material, to the claim for relief." Fish, at ¶ 15 (quoting *Anderson*, at ¶ 14).

[¶ 33] Abdullah has not identified facts to support an ADA claim or to identify a disability under the relevant statutes, or how those factual assertions may be relevant to his legal theory. We agree with the district court that Abdullah has failed

to provide any facts to show that the University regarded his bout with sleep deprivation as a disability and that the University dismissed Abdullah from the residency program because of that perceived disability. The evidence before the Hearing Panel establishes that the decision to dismiss Abdullah was not based on his perceived mental health, but was based on his lack of professionalism. On this record we conclude the district court did not err in granting summary judgment on Abdullah's ADA claim.

## IV

[¶ 34] We affirm the summary judgment.

[¶ 35] GERALD W. VANDE WALLE, C.J., CAROL RONNING KAPSNER, J., RONALD E. GOODMAN, S.J., and KIRK SMITH, S.J., concur.

[¶ 36] The Honorable RONALD E. GOODMAN, S.J., and the Honorable KIRK SMITH, S.J., sitting in place of SANDSTROM, J., and CROTHERS, J., disqualified.